PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Plaintiff-Appellant,*

v.

CENTRAL WHOLESALERS,
INCORPORATED,

*Defendant-Appellee.*

No. 08-1181

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Plaintiff-Appellee,*

v.

CENTRAL WHOLESALERS,
INCORPORATED,

*Defendant-Appellant.*

No. 08-2018

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, Senior District Judge.
(8:06-cv-01673-PJM)

Argued: March 27, 2009

Decided: July 21, 2009

Before WILLIAMS,[1] Chief Judge, and SHEDD and AGEE, Circuit Judges.

---

Reversed in part, affirmed in part, and remanded by published opinion. Judge Shedd wrote the opinion, in which Judge Agee joined.

---

## COUNSEL

**ARGUED:** Daniel Travis Vail, U.S. EQUAL EMPLOY-MENT OPPORTUNITY COMMISSION, Washington, D.C., for Equal Employment Opportunity Commission. Fred Saul Sommer, SHULMAN, ROGERS, GANDAL, PORDY & ECKER, PA, Rockville, Maryland, for Central Wholesalers, Incorporated. **ON BRIEF:** Ronald S. Cooper, General Counsel, Vincent J. Blackwood, Acting Associate General Counsel, Carolyn L. Wheeler, Acting Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Equal Employment Opportunity Commission. Meredith S. Campbell, SHULMAN, ROGERS, GANDAL, PORDY & ECKER, PA, Rockville, Maryland, for Central Wholesalers, Incorporated.

---

[1]Chief Judge Williams heard oral argument in this case but did not participate in the decision. The decision is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d).

**OPINION**

SHEDD, Circuit Judge:

This appeal arises from a civil rights action brought by the Equal Employment Opportunity Commission on behalf of La Tonya Medley, an African-American female. The EEOC alleges that Medley's former employer, Central Wholesalers, Inc. ("Central"), subjected her to a hostile work environment based on her gender and race and constructively discharged her. The district court granted summary judgment for Central but denied Central's motion for attorneys' fees. Both parties appealed. For the foregoing reasons, we reverse the district court's grant of summary judgment, affirm its order on attorneys' fees, and remand for further proceedings.

I

When reviewing a district court's grant of summary judgment, we construe the facts in the light most favorable to the nonmoving party, which in this case is the EEOC. *See Laber v. Harvey*, 438 F.3d 404, 415 (4th Cir. 2006) (en banc). Viewed in this light, the facts are as follows.

A.

Central is a maintenance supply company located in Laurel, Maryland. Central hired Medley in 2002, and she started working in the company's Inside Sales department in September 2004, where she worked until her employment ended in November 2004. Medley's supervisor in Inside Sales was Lynette Wright, and Wright reported directly to Central's President, Drew Denicoff. Including Wright, there were a total of eight employees in Inside Sales, and Medley was the only African-American female. She was also the only female other than Wright.

During the relevant time period, Central had a policy against discrimination, harassment, and retaliation. Under the

policy's complaint procedures, Central encouraged employees who believed they were being discriminated against or harassed to notify the offender directly or contact a supervisor or other personnel, including Central's President. If a supervisor received a complaint, the policy required the supervisor to report it immediately to Central's Equal Employment Opportunity Officer or Central's President. Central's policy also provided that all reports of discrimination or harassment would be promptly investigated and that appropriate action would be taken.

### B.

Medley's allegations of gender- and race-based discrimination and harassment cover the two-month period she worked in Inside Sales and are based primarily on the language and conduct of four co-workers: three employees in Inside Sales who worked right next to or one cubicle down from Medley (Tony Monaghan, his son Mike Monaghan, and Doug Green), and one of Central's locksmiths who worked in Central's lock shop (Tom DaBay).[2] As discussed in more detail below, the facts, viewed in the light most favorable to the EEOC, show that Medley's co-workers uttered a steady stream of racial and gender epithets and engaged in inappropriate racial and gender-based conduct.

### 1.

Consistent with Central's anti-harassment policy, Medley initially approached her co-workers directly and notified them that she found their conduct and language objectionable. The language and conduct Medley heard and witnessed while she worked in Inside Sales included the following. Tony referred to women as b\*\*\*hes on a daily basis, and used the word

---

[2]Because Mike and Tony have the same last name, we will refer to them by their first names. We note that none of the four co-workers identified above held supervisory positions with respect to Medley.

n****r "pretty much every day," J.A. 78. Green also referred to women as b***hes and used the word n****r. Likewise, Mike referred to women as b***hes on a daily basis, and used the word n****r. Mike also used a pornographic screensaver on his computer which depicted partially naked women.

These three individuals ignored Medley's initial complaints about their language and conduct. For example, Mike did not remove his pornographic screensaver in response to Medley's complaints and, in fact, it remained on his computer for some period of time. Her co-workers also increased their use of profanity, adding racial jokes and ethnic slurs, after she complained to them about it.

2.

Medley also complained to Wright, her supervisor, about her co-workers' conduct and language. For instance, after Medley overheard Mike watching pornography on his computer during work, she complained to Wright about it, telling Wright that she could literally hear the sounds of people having sex coming from Mike's cubicle, which was right next to hers. She also complained to Wright about Mike's use of the pornographic screensaver, and about her co-workers' use of the word n****r and their profanity.

At first, Wright did nothing in response to Medley's complaints. When Wright did eventually speak with Medley's co-workers, however, her response was not effective. Medley's co-workers' use of profanity just got worse, and Mike continued to watch pornography at his desk in Medley's presence. Moreover, Mike's pornographic screensaver did not disappear until approximately a week and half after Medley first complained to Wright about it.

Later, on September 24, 2004, someone other than Medley complained to Wright about Mike's pornographic screensaver. In response to this complaint, Wright had Mike's scr-

eensaver removed. Wright also spoke with Mike that day about his viewing of pornography at work. Even though Mike denied the allegation, Wright had his Internet access removed. Central also reviewed Mike's Internet usage and it reached the conclusion that Mike had not visited any pornographic Internet sites.

However, these actions did not completely remedy the situation. Mike got his Internet access back, and he eventually started watching pornography at his desk again, either over the Internet or otherwise. Also, Mike was upset that Central had temporarily removed his Internet access and blamed Medley. He cursed at her and called her a mother f\*\*ker. Tony was upset that Central removed his son Mike's screensaver, so he cursed loudly in Medley's presence.

After Medley told Denicoff about Tony's cussing, Denicoff met with Tony and addressed his profanity and the inappropriateness of Mike's screensaver. Tony promised to do his best not to curse anymore and stated that he had no problem with Mike's screensaver being removed.

3.

On September 24, Wright approached Medley and suggested that she interview for a position in Central's Accounts Receivable department. Medley interpreted this gesture as an attempt to force her out of Inside Sales because of her complaints. Accordingly, Medley sent an e-mail later that day to Wright and to Central's Human Resources representative, Lisa Beall, stating that it was unfair to ask her to move to another department because of her co-workers' inappropriate behavior. In her e-mail, Medley noted the pornographic screensaver which had been on Mike's computer and other offensive material around the office. Beall forwarded this e-mail to Denicoff.

Central took steps in response to Medley's September 24 e-mail. Denicoff and Beall met with Medley that day to discuss

her allegations. During this meeting, Medley told Denicoff about Mike watching pornography at his desk and about the pornographic screensaver. Medley also told Denicoff that Mike kept a number of Playboy items in his cubicle, including a Playboy calendar, Playboy magazines, and a Playboy poster. Denicoff told Medley that Central considered explicit screensavers and the viewing of pornography to be unacceptable. Medley also complained to Denicoff during this meeting about her co-workers' use of the word n****r.

In addition to meeting with Medley, Denicoff held a meeting with Wright to discuss Medley's complaints because Wright was a new manager. During this meeting, Denicoff told Wright that it was not acceptable for employees to have screensavers depicting women in bikinis and that she should not tolerate those kinds of things. Denicoff held a meeting with Mike as well. At this meeting, Denicoff told Mike that viewing pornography at work was outrageous and would not be tolerated. Mike denied ever looking at pornography, and Denicoff believed him. Denicoff also walked around the Inside Sales department to determine whether any of the pornographic or offensive materials described by Medley were present, but he did not find any such materials.

4.

Central's response to Medley's September 24 e-mail did not prove to be effective. About a week later, on October 5, Medley sent an e-mail to Denicoff complaining that the Playboy calendar was still on Mike's desk. Medley also complained that the profanity in the department was out of control.

As it did in response to Medley's earlier e-mail, Central took steps to address the complaints presented in her October 5 e-mail. Regarding the calendar, Denicoff walked through Inside Sales in an attempt to locate it, but he did not find the calendar or any depictions of partially dressed women. Fur-

thermore, he did not hear any profanity during this walk-through.

As part of his investigation, Denicoff met with Wright on October 6. During this meeting, Wright acknowledged that Mike might still have the Playboy calendar on his desk. Denicoff responded by telling Wright that such a calendar was not acceptable.

Later that day, Denicoff and David Baxley, another manager at Central, met with Medley. Medley told them that Mike still had the calendar on his desk, that nothing had been done in response to her original complaint, and that there was still a lot of profanity being used in the department. Denicoff told Medley that Central does not allow such calendars and has them removed when it becomes aware of them. Denicoff also told Medley that Central prefers to have no profanity in the work place and emphasized that racial or sexual slurs would never be tolerated.

After the meeting with Medley, Baxley walked through Inside Sales and found the Playboy calendar on Mike's desk along with the other Playboy items, including magazines and a poster. Denicoff and Baxley then met with Mike and directed him to remove the calendar. They also warned him about having items like that at work, and they asked him about the profanity in the department. Mike agreed to remove the calendar and to work on his cussing.

In addition, Denicoff held a group meeting with employees in Inside Sales on October 7 to remind them about Central's policy regarding profanity. Denicoff stated that he preferred no profanity in the work place and, while he understood some might occasionally come out, racial or sexual slurs would never be tolerated.[3]

---

[3]Neither Medley nor Tony attended this meeting because they were both out sick. However, Wright discussed the meeting with Tony when he returned to work.

5.

Again, Central's response did not entirely resolve the situation. Sometime around October 31, Mike placed a screwdriver in a Halloween decoration, making it appear as if the decoration had a penis. Wright removed the screwdriver, but Mike placed it right back in the same location. Medley then removed the screwdriver herself. Wright would later have a meeting with Mike in which she screamed at him for placing the screwdriver back in the decoration. Sometime in late October or early November Mike stopped showing up for work, and Central treated this as a resignation.

6.

Finally, on November 10, Medley went to DaBay's office at Wright's direction to inquire about a lock for a customer. DaBay indicated that he did not know anything about the lock, and when Medley asked him if he was sure, DaBay stood up and yelled at her. DaBay asked: "Are you f**king stupid?" "Are you a dumb f**k?" J.A. 412. He then called her a stupid motherf**ker, a black stupid b***h, and a black stupid n****r, among other things. He said: "B***h, if I tell you something you better listen"; "F**k you if you don't believe me when I tell you something"; and "I should kick your mother f**king ass." J.A. 412. DaBay then turned to another employee who was present and stated: "You better school that b***h and let her know she better stay out my face before something happens to her." J.A. 413.

Medley was upset by her encounter with DaBay and complained to Wright. Wright then went into DaBay's office to explain why Medley inquired about the lock, and DaBay responded by yelling at Wright. He referred to Medley as a dumb b***h in front of Wright and then told Wright "f**k this," before he walked away. J.A. 413. A few minutes later, DaBay went into Wright's office and asked her to grab her coat and join him behind Central's warehouse in the smoking

area. DaBay used this meeting with Wright to "vent" about Medley and apparently to relate what he had done to her. J.A. 260.

While Wright was outside with DaBay, Medley was in tears in JoAnn Starner's office. Starner was a manager in Central's Customer Service department and was Medley's former supervisor. Medley complained to Starner about the incident with DaBay, including DaBay calling her a black n****r and a black stupid n****r. Medley also reported to Starner that both Tony and DaBay kept blue-colored dolls with mop-heads in their offices and that the dolls were hanging by nooses tied around their necks. Because Starner was a supervisor at Central, the company's policy required her to report Medley's statement about the blue-colored mop-head dolls immediately to Central's Equal Employment Opportunity Officer or Central's President. However, there is no evidence that Starner informed anyone about Medley's statement; nor is there any evidence that Central took any action with respect to the mop-head doll in Tony's office, although, as discussed below, Central took some action with respect to the doll in DaBay's office.

When Wright returned to the office after speaking with DaBay outside, she walked into Starner's office laughing, apparently not seeing Medley sitting in the corner, and said "guess what Tom [DaBay] did to La Tonya [Medley]." J.A. 413. Medley stood up and told her it was not funny and that she had just been threatened. Medley then informed Wright that she was leaving for the day because she did not feel safe in that environment.

When Medley got home later that day, she sent an e-mail to Wright and Denicoff complaining about DaBay and stating that she was subjected to a violent and hostile work environment. No one at Central responded to her e-mail. Two days later, an attorney representing Medley sent a letter to Denicoff stating that Medley would not be returning to work. The letter

stated that Medley was subjected to a hostile work environment and cited, among other things, the November 10 incident with DaBay, Mike's Playboy items, the use of profanity, and Mike and DaBay's public display of the blue-colored mop-head dolls which were hanging by nooses tied around the dolls' necks. Later, Medley stated that the incidents at Central caused her emotional distress.

In response to the November 10 incident, Central conducted an investigation. According to Central, none of the persons it interviewed, including one of DaBay's assistants who is African-American, recalled DaBay using racial or sexual slurs. Denicoff and Baxley met with DaBay and asked him to do his best not to yell or curse. Denicoff also told DaBay to remove the blue-colored mop-head doll from his office. DaBay was also given a verbal reprimand, and Central sent him to anger management-type training. Since Medley never returned to work, Denicoff stated that he was not sure any further action was necessary.

## C.

After Medley filed a charge of discrimination with the EEOC, the EEOC initiated this action by filing a complaint in the district court under Title VII. The EEOC alleged that Central violated Title VII by subjecting Medley to a hostile work environment based on her gender and race and constructively discharging her.

Central moved for summary judgment on all of the EEOC's claims, and the district court granted its motion. With respect to the EEOC's gender-based claim, the district court determined that the language and conduct at issue were not gender specific and therefore failed to raise a claim under Title VII. The district court then determined that even if the language and conduct were gender-specific, the environment was not sufficiently severe or pervasive to create a sexually hostile working environment. Turning to the EEOC's race-based

claim, the district court determined that Medley failed to give Central a reasonable opportunity to investigate and correct the situation because she never returned to work after the November 10 incident, and in any event the company conducted a reasonable investigation under the circumstances.

Following the district court's entry of summary judgment, Central filed a motion for attorneys' fees and a bill of costs. The district court denied Central's motion for attorneys' fees but awarded it costs associated with certain depositions. The EEOC now appeals from the district court's grant of summary judgment, and Central appeals from the court's denial of its motion for attorneys' fees.

## II

We turn first to the district court's grant of summary judgment to Central. We review this judgment de novo, "viewing the facts in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Garofolo v. Donald B. Heslep Assocs., Inc.*, 405 F.3d 194, 198 (4th Cir. 2005). Summary judgment should only be rendered if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] . . . sex." 42 U.S.C. § 2000e-2(a)(1). "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R&R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001).

For us to reverse the district court's grant of summary judgment to Central, the EEOC must establish that the evidence

— viewed in its favor — would allow a reasonable jury to conclude that the harassment was (1) unwelcome, (2) based on Medley's gender or race, (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere, and (4) imputable to Central. *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 313-14 (4th Cir. 2008). We address each of these four elements in turn.

## A.

First, the EEOC must establish that a reasonable jury could conclude that the gender- or race-based harassment was "unwelcome." As discussed above, the evidence indicates that Medley complained about both types of harassment to her co-workers, to supervisors, and to Central's President, and she told them that she found both types objectionable. Based on this evidence, we find that a reasonable jury could find that both forms of harassment were unwelcome. *See id.* at 314 (concluding that a jury could find the harassment "unwelcome" because the victim "indicated to both management and his coworkers that he found the . . . demeaning conduct to be offensive").

## B.

Second, the EEOC must establish that a reasonable jury could find that the harassment was based on Medley's gender or race. The evidence shows that one or more of Medley's co-workers used the word b***h on a daily basis when referring to women, had Playboy items around the office, watched pornography right next to Medley such that she could hear the sounds of people having sex, and used a pornographic screen-saver depicting partially naked women. Moreover, DaBay called Medley a b***h a number of times during the November 10 incident. In light of this evidence, a reasonable jury could conclude that the harassment was based on Medley's gender. *See, e.g.*, *Forrest v. Brinker Intern. Payroll Co., LP*, 511 F.3d 225, 229 (1st Cir. 2007) (stating that a "raft of case law" "es-

tablishes that the use of sexually degrading, gender-specific epithets, such as . . . 'bitch,' has been consistently held to constitute harassment based upon sex").

The evidence also shows that a number of Medley's co-workers used the word n****r in her presence on a regular basis, and at least one co-worker used the word "pretty much every day." Moreover, DaBay called Medley a black stupid n****r and other racially derogatory terms during the November 10 incident. In addition, both Tony and DaBay kept blue-colored mop-head dolls in their offices and had the dolls hanging from nooses which were tied around the dolls' necks. Given this evidence, a reasonable jury could conclude that the harassment was also based on Medley's race. *See, e.g.*, *White v. BFI Waste Services, LLC*, 375 F.3d 288, 298 (4th Cir. 2004) (stating that "the word 'n[****]r' is pure anathema to African-Americans [and] . . . an unambiguously racial epithet" (quotation marks omitted)).

## C.

Third, the EEOC must show that a reasonable jury could find that the gender- or race-based harassment was so severe or pervasive as to alter the conditions of Medley's employment and create an abusive or hostile atmosphere. This element of a hostile work environment claim has both subjective and objective components. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-23 (1993). Therefore, the EEOC must show that Medley did perceive, and a reasonable person would perceive, the environment to be abusive or hostile. *Id.*

With respect to the subjective component, we conclude that a reasonable jury could find that Medley perceived both types of harassment to be sufficiently abusive or hostile. As noted above, she complained about both types of harassment and stated that she found such harassment objectionable. She also stated that the harassment caused her emotional distress. Therefore, the EEOC has created a triable issue on this point.

*See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185-86 (4th Cir. 2001) (finding that a victim's complaints to supervisors about harassment shows he or she believed the environment was hostile or abusive).

Next, we consider whether the gender- or race-based harassment was objectively severe or pervasive. This objective inquiry "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22. "Rather, when determining whether the harassing conduct was objectively severe or pervasive, we must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Sunbelt*, 521 F.3d at 315 (quotation marks omitted). "[N]o single factor is" dispositive, *Harris*, 510 U.S. at 23, as "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed," *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82 (1998).

Because we have "recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test," *Sunbelt*, 521 F.3d at 315, the EEOC must show that the environment was pervaded with discriminatory conduct "aimed to humiliate, ridicule, or intimidate," thereby creating an abusive atmosphere, *Jennings v. U.N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc). We conclude that a reasonable jury could find that the gender-based harassment was objectively severe or pervasive. The evidence shows that Mike, Tony, and Green all regularly referred to women as b***hes. Moreover, DaBay called Medley a b***h a number of times during the November 10 incident. In addition, Mike — whose cubicle was right next to Medley's — had a Playboy calendar on his desk, kept Playboy magazines in his cubicle, hung a Playboy poster on his wall, watched pornography on his computer in Medley's

presence, used a pornographic screensaver depicting partially naked women, and placed the screwdriver in the Halloween decoration in a sexual manner more than once. This evidence is certainly sufficient to create a triable issue on whether the gender-based harassment was objectively severe or pervasive. *See, e.g.*, *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 981-82 (4th Cir. 1997) (finding that pornography, including "posters of scantily clad women," "contributed to the sexually hostile environment"); *see also Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000 (10th Cir. 1996) ("It is beyond dispute that evidence that a woman was subjected to a steady stream of vulgar and offensive epithets because of her gender would be sufficient to establish a claim under Title VII . . . ." (quotation marks omitted)).

We also conclude that a reasonable jury could find that the race-based harassment was objectively severe or pervasive. Three of Medley's co-workers in Inside Sales used the word n****r, and at least one of them used it "pretty much everyday." Moreover, during the November 10 incident, DaBay called Medley a black stupid n****r, a black n****r, and a black stupid b***h, among other derogatory terms. In addition, two of her co-worker's kept blue-colored mop-head dolls in their offices which they had hanging by nooses tied around the dolls' necks. As in past cases, "[w]e cannot ignore . . . the habitual use of epithets here or view the conduct without an eye for its cumulative effect." *Sunbelt*, 521 F.3d at 318. Therefore, we conclude that the EEOC created a triable issue on whether the race-based harassment was objectively severe or pervasive. *See Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995) (finding the alleged harassment was sufficiently severe or pervasive because an Iranian plaintiff was called "names like 'the local terrorist,' a 'camel jockey' and 'the Emir of Waldorf'" on an almost daily basis).

## D.

Finally, the EEOC must establish a "basis for imposing liability on" Central for the gender- or race-based harassment.

*Gilliam*, 474 F.3d at 142. It can do this by showing that Central knew about the harassment but did not "respond with remedial action 'reasonably calculated to end the harassment.'" *Sunbelt*, 521 F.3d at 319 (quoting *Amirmokri*, 60 F.3d at 1131-32).

1.

In this case, we find that the evidence, viewed in the light most favorable to the EEOC, shows that Central knew about both types of harassment. As discussed above, Medley complained to her supervisor (Wright) and to Central's President (Denicoff) about her co-workers' harassment on a number of occasions. For example, Medley complained to Wright and Denicoff about her co-workers' use of the word n****r, and she also complained to them about Mike watching pornography at his desk, Mike's pornographic screensaver, the Playboy items in Mike's cubicle, and the November 10 incident with DaBay.

2.

We must next determine whether a reasonable jury could find that Central did not respond with corrective action reasonably calculated to end the harassment. *Sunbelt*, 521 F.3d at 320. This is not a case where the employer took no action in response to an employee's complaints. Indeed, Central took a number of steps in an apparent effort to address Medley's complaints. For example, Denicoff walked around the department where Medley worked to determine whether any of the pornographic or offensive materials she described were present. He also held a number of meetings with Medley, and with her supervisor, and with the co-workers Medley complained about in an effort to address the situation. Central also had a policy in place against discrimination, harassment, and retaliation.

Despite these efforts, Central's response was not without its apparent shortcomings. The evidence shows that Medley

made a number of complaints that Central either failed to respond to in a timely manner or failed to respond to at all — even though its anti-harassment policy required the company to promptly investigate all such complaints and to take appropriate action. For example, Mike's pornographic screensaver was not removed until a week and a half after Medley first complained about it, and Wright did not take any action in response to Medley's initial complaints about her co-workers' use of the word n****r. Denicoff also took no action in response to Medley's complaints about her co-workers' regular use of the word n****r other than mentioning in general that racial slurs would not be tolerated when he held a meeting with Inside Sales to address profanity. Central also took no action in response to Medley's report about the blue-colored mop-head doll which Tony had hanging in his office by a noose tied around its neck.

Moreover, a number of Central's remedial efforts proved completely ineffective. As noted, Denicoff walked around Inside Sales on at least two occasions in an effort to locate the pornographic material Medley was complaining about, but he never found the Playboy calendar which was on Mike's desk. Similarly, while Central removed Mike's Internet access in response to Medley's complaint that he was watching pornography in the cubicle right next to hers, Mike continued to view pornography at work, either over the Internet or otherwise. In other words, there was a clear pattern in this case of complaints by Medley and then responses by Central that consistently failed to end the harassment.

The nature of the harassment experienced by Medley also became more severe in some respects after she started complaining. For example, after Medley complained directly to her co-workers about their language, as Central's anti-harassment policy suggested, her co-workers increased their use of racial jokes and ethnic slurs. Moreover, the November 10 incident with DaBay occurred after Medley started complaining to Central managers and after she had a number of

meetings with management about the harassment she was experiencing.

Viewing this evidence in the light most favorable to the EEOC, we find that a rational juror could find that Central "failed to take additional action . . . reasonably calculated to end the harassment." *Sunbelt*, 521 F.3d at 320. A jury could find that, in addition to responding in a timely manner to all of Medley's complaints and taking increasingly progressive measures to address the harassment when its responses proved ineffective, Central could have, as the EEOC suggests, demoted the four primary offenders, suspended them from work, reduced their pay, or issued them written reprimands, yet Central took none of these actions in response to Medley's complaints.[4] We hold, therefore, that Central's "response was not sufficient on these facts to warrant summary judgment." *Id.*

We want to emphasize, however, that we are not attempting to create an exhaustive list of remedial measures an employer could employ, nor do we intend our opinion to be read as suggesting that Central could have prevailed on summary judgment if it employed a particular combination of the remedial steps we identified above. Instead, we list these measures to illustrate the types of remedial actions that Central did not take and that a rational jury could find would have been reasonably calculated to end the harassment. In short, when an employer has notice of the harassment, it must take steps reasonably calculated to end the harassment. *Id.*

---

[4]Central clearly had the authority to terminate the employees who made the types of remarks reported by Medley. In fact, more than a year after Medley stopped working at Central, the company terminated Tony at least in part because he had been directing racial slurs toward a different female employee.

### III

We now address the district court's order denying Central's motion for attorneys' fees, which we review for an abuse of discretion. *See Johnson v. City of Aiken*, 278 F.3d 333, 336 (4th Cir. 2002). Central contends that the district court erred in refusing to award it attorneys' fees under 42 U.S.C. § 2000e-5(k), which authorizes the court to award fees to a "prevailing party." *See* 42 U.S.C. § 2000e-5(k); *see also Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978). Because we are reversing the district court's grant of summary judgment to Central, Central is not a "prevailing party" within the meaning of § 2000e-5(k), and we therefore affirm the district court's judgment on this basis. *See Walker v. United Parcel Service, Inc.*, 240 F.3d 1268, 1279 (10th Cir. 2001).

### IV

Based on the foregoing, we reverse the district court's grant of summary judgment to Central, affirm its denial of Central's motion for attorneys' fees, and remand for further proceedings consistent with this opinion.

*REVERSED IN PART,*
*AFFIRMED IN PART,*
*AND REMANDED*