**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 18-1448**

DEANNA EVANS,

      Plaintiff - Appellant,

v.

INTERNATIONAL PAPER COMPANY,

      Defendant - Appellee.

Appeal from the United States District Court for the District of South Carolina, at Columbia.  J. Michelle Childs, District Judge.  (3:16-cv-01215-JMC)

Argued:  May 9, 2019                        Decided:  August 27, 2019

Before NIEMEYER, KEENAN, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Niemeyer and Judge Keenan joined.

**ARGUED:**  Shannon Marie Polvi, CROMER BABB PORTER & HICKS, LLC, Columbia, South Carolina, for Appellant.  Kristin Starnes Gray, FORD & HARRISON LLP, Spartanburg, South Carolina, for Appellee. **ON BRIEF:** Matthew J. Gilley, FORD & HARRISON LLP, Spartanburg, South Carolina, for Appellee.

QUATTLEBAUM, Circuit Judge:

Alleging gender and race discrimination, Deanna Evans brought claims against International Paper Company ("IPC") under Title VII of the Civil Rights Act of 1965, 42 U.S.C. §§ 2000e, *et seq.*, ("Title VII") and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA"). Evans alleged: (1) hostile work environment based on race discrimination, (2) hostile work environment based on gender discrimination, (3) retaliation and (4) pay discrimination. After discovery, IPC moved for summary judgment. The district court concluded that Evans failed to create a genuine issue of material fact as to each of her claims. Evans now appeals that order granting summary judgment. After a de novo review of the record, we affirm.

I.

In 2007, Evans, an African American female with a chemical engineering degree and a masters in business administration, began work for IPC as a process engineer in its Mississippi plant. Evans received several promotions and recognitions while at IPC. In 2008, IPC promoted Evans to level two engineer. In 2009, Evans transferred to IPC's paper mill in Eastover, South Carolina (the "Eastover Mill").[1] In 2010, IPC promoted Evans to

---

[1] The mill, which produces paper and pulp, is located in the small South Carolina town of Eastover. Founded in 1880, Eastover is twenty miles southeast of South Carolina's capitol city of Columbia, near the convergence of the Wateree and Congaree Rivers. In fact, the name Eastover was selected because the town was "over to the east" of the Congaree River.

process manager. In 2013, IPC again promoted Evans, this time to a technical quality leader position.

In addition to her promotions, IPC selected Evans to lead its successful effort to achieve ISO certifications for the Eastover Mill. Paul Varadi, the manager of the department that sponsored the ISO projects, and others praised Evans for her role in helping the mill obtain the ISO certifications. Varadi also thanked Evans for her good work throughout her employment at IPC.

In January 2014, Evans received a "result exceeded commitment," the highest possible evaluation rating. Only a small percentage of Eastover employees received an "exceeds" rating.

Evans also received two prestigious awards during her time at IPC. After being recommended by Varadi and others in IPC's management, IPC's Chief Executive Officer awarded Evans the prestigious Chairman's Coin award. Also, upon Varadi's recommendation, Evans received the Key Driver Award for extraordinary performance. IPC rarely gives these awards to employees early in their careers. IPC identified Evans as a potential leader in the company.

But despite her successes, Evans experienced problems at IPC that she attributes to race and gender. A review of the record reveals these problems fall into two broad categories. First, Evans alleges she was mistreated in comparison to white, male employees. Second, she claims white, male co-workers made racially insensitive and offensive comments to her.

We begin with the allegations of mistreatment. Shortly after her transfer to Eastover, Evans heard two employees say that they did not want her in Eastover and were forced to take her. After Evans returned from maternity leave, she learned from her supervisor at the time, Gary Nyman, that certain white, male employees had said they thought that they had run her off.

Evans also claims Nyman criticized her managerial decisions and yelled at her on several occasions. Nyman's communications, Evans asserts, were always negative. Evans testified Nyman did not engage with her or give her leadership roles like he did with white, male employees. She also said Nyman frequently did not respond to her questions and proposals, and he helped white, male co-workers more than African American employees. When Evans told Nyman about mistreatment by other managers, he took no action despite acknowledging Evans was being targeted.[2]

In 2014, one of IPC's customers under Evans' responsibility visited the Eastover Mill. Varadi, who was by this time Evans' supervisor, asked a white, male employee who reported to Evans, rather than Evans, to facilitate meetings with the customer and arrange for a group dinner. When Evans asked Varadi why she was not facilitating the visit, Varadi said he thought she was not available. After Evans raised her concerns, Varadi gave Evans a role in the meeting with the customer.

---

[2] In October 2014, Evans reported concerns about Nyman to IPC corporate human resources manager Sabrina Townsend. Townsend met with Evans as well as other Eastover Mill employees in response to an IPC Ethics Helpline call from another Eastover employee claiming racial discrimination. After the interviews, IPC closed its investigation having found no evidence to substantiate the other employee's claims.

In early 2015, Evans received her 2014 annual evaluation. In it, she received a "results met commitment" rating, the second-highest rating. Evans acknowledged that rating was considered "good" and understood that employees rarely received back to back "results exceeds" ratings. But she disagreed with Varadi's comment that "Deanna needs to continue to develop her interfacing and technical skills to be viewed as a reliable troubleshooting resource by the FP team[]" because Varadi did not provide specific examples. J.A. 380–81.

Turning next to the complaints about racially insensitive comments, in 2012, a white, male employee said during a performance review meeting in which Evans participated that another African American female employee acted like she was "from a shoot em up, bang bang neighborhood." J.A. 163. Evans, offended by the comment, complained about the incident to Nyman, but he did nothing about it. Evans also spoke with IPC's human resources representative, Audrey Bright, about Nyman. Bright encouraged Evans to advise Nyman about her concerns and to contact her if she needed support.

In 2015, a white co-employee told Evans that her natural hairstyle was unprofessional and nicknamed her Angela Davis, after the civil rights and Black Panther activist who he thought had a similar hairstyle to Evans. When Evans inquired about the nickname, the employee told her that Davis stirred up a lot of trouble. Varadi also said her

hairstyle was not an appropriate hairstyle for the office.[3] And another white co-employee "said many comments about my hair texture. When I would wear my hair in different styles, as far as in braids, when I had to cut my hair, any style I had with my hair, he always had something to say, so it was continuous every hairstyle that I had." J.A. 310. This employee told her she was using a different dialect, made jokes about her education and, according to Evans, created barriers anytime she communicated to the group.

Additionally, the record contains evidence of several racially inappropriate comments made to other IPC employees. Evans testified that she was told there had been some racial slurs made in the past at IPC. However, Evans was not aware of the details and understood they took place before she arrived at the Eastover Mill.

By February 2015, Evans was considering resigning from IPC. She began interviewing with other potential employers. On March 10, 2015, Evans submitted the following Notice of Resignation:

> I am writing to submit my resignation from the position of Technical Quality Leader at International Paper effective March 24, 2015. It was not easy to make the decision to leave after seven years. Although my time with International Paper has been, on the whole, satisfying and productive; it also had its challenges. I would like to thank you for the great experience you have provided me and I believe I have fulfilled my duties to the best of my ability. One of the highlights of my career was implementing the quality and environmental management system that resulted in ISO 9001 & 14001

---

[3] After speaking with Varadi about her evaluation, Evans met with Eastover Mill Manager Hai Ninh. Evans told Ninh that the environment at Eastover was uncomfortable, stressful, hostile and unsupportive. Evans also reported to Ninh the comments about her hair and the Angela Davis nickname. Ninh met with Varadi about the hair comment. In response, Varadi asked to speak with Evans. According to Evans, Varadi did not recall making the statement, but apologized and never made such a comment again. Ninh followed up with both Evans and Varadi and both told Ninh that they resolved the issue and were moving forward.

certification. If there is anything I can do to make this transition easier for the company over the next two weeks, please let me know and I'd be more than happy to assist! This includes assisting in recruiting and training my replacement. Thank you again for the opportunity to work with International Paper. I wish you and the staff all the best with your future endeavors!

J.A. 478.

Evans testified that upon receipt of her resignation, Varadi acted stunned but not ill mannered. Ninh said that Evans' resignation shocked everyone. The next day, Evans requested an exit interview. Ninh replied, "I am not ready to accept the reality. Are you sure nothing I can do or help? IP is a huge company and I am sure we can accommodate your needs. You are very talented and well regards [sic]." J.A. 502.

Shortly thereafter, Varadi sent Evans a pen and a letter thanking her for her efforts, hard work and leadership. Varadi stated, "I feel very fortunate to have been able to work with you and learn from you. I want to wish you the best of luck in your future endeavors. Please keep in touch as I will be anxious to follow your career & learn of your future successes." J.A. 501. Similarly, Evans' ISO steering team, including Varadi, hosted a farewell lunch for her.

During exit interviews with Ninh and Bright, Evans discussed the comments about her hair and Angela Davis. She also complained about the environment she experienced as an African American female. And Evans expressed frustration that corrective actions were not taken when she complained about the work environment.

After the interviews, Evans emailed Ninh thanking him for listening to her concerns. She attached a written summary of her exit interview where she reiterated her concerns. In

7

the summary, she wrote "[d]ue to the current working environment, I have decided to seek other opportunities." J.A. 506.[4]

On July 2, 2015, Evans filed a claim with the South Carolina Human Affairs Commission ("SCHAC") and the Equal Employment Opportunity Commission ("EEOC") against IPC alleging race and gender discrimination and retaliation. After receiving her right-to-sue letter, Evans filed a lawsuit against IPC in state court. IPC removed the case to federal court and, after the completion of discovery, moved for summary judgment. The magistrate judge issued a report recommending that IPC's motion be granted as to Evans' retaliation and unequal pay claims but denied as to Evans' claims for constructive discharge based on a hostile work environment. The district judge granted summary judgment in favor of IPC as to all of Evans' claims, thus adopting in part and denying in part the magistrate judge's recommendation. Evans timely appealed.

## II.

This Court "review[s] the district court's grant of summary judgment de novo, applying the same legal standards as the district court and viewing the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996) (emphasis omitted). Summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When

---

[4] Soon thereafter, Evans went to work for another manufacturing company.

a party fails to establish the existence of an element essential to that party's case, there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If there are genuine issues of material fact, courts should not weigh the evidence. *Id.* at 249. But "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991).

### III.

On appeal, Evans argues that the district judge erred by finding she failed to present sufficient evidence to withstand summary judgment as to: (1) the severe or pervasive element of her hostile work environment claims; (2) an adverse employment action for her retaliation claim; and (3) proper comparators under the EPA. We address each of these arguments in turn.

### A.

### 1.

In considering Evans' hostile work environment argument, it is important to first examine the nature of Evans' claims. Evans' first two causes of action allege that she was subjected to a hostile work environment on account of her race and gender and, as a result, was constructively discharged in violation of Title VII. In other words, rather than alleging

9

a separate constructive discharge claim, Evans alleged constructive discharge to be one of the results of her hostile work environment. Although the allegations in her complaint admittedly alleged additional damages, by the summary judgment stage of the case, the district court found Evans' "hostile work environment claim solely focuses on her constructive discharge" noting "there does not appear to be any dispute" on that issue. *Evans v. Int'l Paper Co.*, CA No. 3:16-01215-JMC, 2018 WL 1558870, *6 n.3 (D.S.C. 2018).

This conclusion is supported by the magistrate judge's characterization of Evans' claims in her Report and Recommendation, Evans' failure to object to that characterization in her Objections to the Report and Recommendation, IPC's Memorandum in Support of its Motion for Summary Judgment and Evans' failure to object to IPC's combined claim characterization in her Memorandum in Opposition to IPC's Motion for Summary Judgment. It is also consistent with Evans' briefing on appeal. In sum, the record below and on appeal indicates Evans' hostile work environment claim was combined with her constructive discharge claim.

Importantly, the Supreme Court in *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004) has recognized such a combined hostile work environment constructive discharge claim referred to as a "hostile-environment constructive discharge" claim. Thus, we will treat Evans' claim accordingly.

2.

We now turn to the law applicable to such a hostile-environment constructive discharge claim. To establish a hostile-environment constructive discharge claim, a

10

plaintiff must show the requirements of both a hostile work environment and a constructive discharge claim. *See Suders*, 542 U.S. at 146–47.

Beginning with the required elements of a hostile work environment claim, the plaintiff must demonstrate: (1) she experienced unwelcome harassment; (2) the harassment was based on her gender or race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).

The severe or pervasive element has both a subjective and objective component. *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). Evans must show that she "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." *Id*. In reviewing Evans' claim, the district court correctly noted that Evans met her burden insofar as she subjectively perceived the environment to be hostile and abusive. The court then paid special attention to the additional requirement that Evans establish a reasonable person in Evans' position would find the environment objectively hostile or abusive.

"[W]hen determining whether the harassing conduct was objectively 'severe or pervasive,' we must look 'at all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "[P]laintiffs must clear a

11

high bar in order to satisfy the [objective] severe or pervasive test." *Id*. "[I]ncidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *Id*. Thus, rude treatment from coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor are not actionable under Title VII. *Id*. at 315–16.

The Supreme Court has also reinforced the steep requirements of a hostile work environment claim. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). The "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation omitted) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

Turning now to the required elements of constructive discharge, the plaintiff must show "something more" than the showing required for a hostile work environment claim. *Suders*, 542 U.S. at 147. To establish a constructive discharge claim, a plaintiff must show "that [s]he was discriminated against by h[er] employer to the point where a reasonable person in h[er] position would have felt compelled to resign" and that she actually resigned. *Green v. Brennan*, 136 S.Ct. 1769, 1777 (2016) (citing *Suders*, 542 U.S. at 148). "'Unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to

12

remain on the job while seeking redress.'" *Suders*, 542 U.S. at 147 (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997)).

"'Intolerability' is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign . . . ." *Blistein v. St. John's Coll.*, 74 F.3d 1459, 1468 (4th Cir. 1996), *overruled on other grounds by Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998), *as recognized by Adams v. Moore Business Forms, Inc.*, 224 F.3d 324, 327 (4th Cir. 2000). Instead, intolerability "'is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign,' . . . that is, whether he would have had *no choice* but to resign." *Id.* (internal citations omitted) (emphasis in original) (quoting *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)).

In assessing intolerability, the frequency of the conditions at issue is important. *See Amirmokri v. Baltimore Gas & Electric Co.*, 60 F.3d 1126, 1132 (4th Cir. 1995) (subjecting the plaintiff to almost daily epithets about his Iranian descent and attempting to embarrass him in public created a genuine issue of material fact about intolerability). The more continuous the conduct, the more likely it will establish the required intolerability. On the other hand, when the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability.

Further, difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign. For example, in *Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004), we held that being yelled at and told you are

13

a poor manager and chastised in front of customers did not create conditions so intolerable as to compel a reasonable person to resign. In *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 273 (4th Cir. 2001), we held that ostracization and required counseling for turning in an inaccurate time card did not make the workplace intolerable. In *Munday v. Waste Management of North America*, 126 F.3d 239, 244 (4th Cir. 1997), we held that being ignored by co-workers and top management was insufficient to establish constructive discharge. And in *Carter v. Ball*, 33 F.3d 450, 459–60 (4th Cir. 1994), we held that being unfairly criticized, losing supervisory responsibilities, and having one's supervisor display a poster that may have been offensive to African Americans was insufficient to establish constructive discharge.

3.

With these principles in mind, we review the district court's decision to grant IPC's motion for summary judgment on Evans' combined hostile work environment constructive discharge claim. The district court carefully explained the applicable law and thoroughly identified the evidence in the record that Evans argues creates a genuine issue of material fact. The court then held "[a]fter considering all of the above allegations and the totality of the circumstances as demonstrated by the evidence presented by [Evans], the court cannot conclude that [Evans] has met her burden of establishing that the alleged treatment she received was objectively severe and pervasive to alter the conditions of employment and create an abusive atmosphere." J.A. 114. Thus, the district court's decision was based on the severe and pervasive requirement for a hostile work environment claim.

14

Without commenting on the district court's decision concerning the severe or pervasive requirement, we believe affirmance is appropriate for a separate and independent reason. As described above, a plaintiff asserting a combined hostile work environment claim must establish that her working conditions were so intolerable that a reasonable employee would have been compelled to resign. *See Suders*, 542 U.S. at 147. Evans has not presented evidence that creates a genuine issue of material fact as to this issue. The record reflects many positive aspects of Evans' employment at IPC. And while we must consider the evidence in the light most favorable to Evans, the evidence she offered about the conditions at IPC does not rise to the level of intolerability required by Supreme Court and Fourth Circuit precedent cited above. The conditions, while no doubt frustrating and unpleasant to Evans, cannot, from an objective perspective, be construed to leave her no choice but to resign. In fact, Evans says as much in her resignation letter. There, she said her time at IPC, despite challenges, had been "on the whole, satisfying and productive." J.A. 478. She even called her tenure at IPC a "great experience." J.A. 478.

For the foregoing reasons, Evans has not presented sufficient evidence to meet her burden of establishing that her working conditions were so intolerable that a reasonable person would have felt compelled to resign. Therefore, Evans' hostile environment constructive discharge claims must be dismissed as a matter of law.

B.

Evans' third cause of action alleges that IPC retaliated against her for engaging in actions protected by Title VII. Title VII prohibits an employer from retaliating against an

15

employee for opposing discriminatory practices in the workplace. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 255 (4th Cir. 1998) (citing 42 U.S.C. § 2000e-3(a)).[5]

To make a prima facie claim of retaliation, a plaintiff must show: (1) that she engaged in protected activity, (2) that the employer took a materially adverse action against her and (3) there is a causal connection between the protected activity and the adverse action. *See Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 61–68 (2006) (redefining the second element to be a "materially adverse action" instead of an "adverse employment action"); *King v. Rumsfeld*, 328 F.3d 145, 150–51 (4th Cir. 2003) (listing the original factors of a retaliation claim pre-*Burlington*). The district court found that Evans failed to demonstrate that she suffered an adverse action and thus failed to make a prima facie case of retaliation. We agree.

To satisfy this element of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this

---

[5] A plaintiff has two potential avenues to avoid summary judgment in a Title VII retaliation claim. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). She may, under what has been referred to as the "mixed-motive" framework, present direct and indirect evidence of retaliatory animus that creates a genuine issue of material fact. *Id.* Or she may proceed under the *McDonnell Douglas* pretext framework. *Id.* Here, the district court appears to have only applied the *McDonnell Douglas* pretext framework. Evans claims the district court erred in doing so because she presented evidence of both avenues of proof. Evans has a point. But any mistake by the district court on this issue makes no difference in the outcome of this appeal because Evans failed to present direct or indirect evidence that created a genuine issue of material fact of retaliatory animus. The evidentiary shortcomings that justify summary judgment under the *McDonnell Douglas* pretext framework lead to the same result under the "mixed-motive" framework. With that clarification, we will address Evans' retaliation claim using the requirements of establishing a prima facie claim.

context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted). The Supreme Court emphasized that the "materiality" requirement was necessary to ensure that only significant harms would be actionable. *Id*. at 68–70. Courts should look at the particular circumstances of the alleged act of retaliation. *Id*. at 69. As the Supreme Court has stated, "[c]ontext matters." *Id*.

Evans asserts that after she reported discriminatory conduct to Townsend in October 2014, and to Varadi and Ninh in January 2015, she experienced adverse actions from IPC. Evans first contends that her 2014 evaluation "results meets commitment" was evidence of an adverse action. But even Evans acknowledges that a "meets" rating is a good rating, and that two "exceeds" ratings in back to back years was very rare. The evaluation comments, as discussed above, were constructive feedback regarding Evans' communication with some of her co-managers. Based on Evans' own testimony, she did not have the best working relationship and communication with her co-managers. Simply because Varadi, whether rightly or wrongly, pointed that out as a growth area for Evans in her evaluation does not rise to the level of materially adverse.

Evans also claims her co-worker made the Angela Davis comment in retaliation for her reporting discriminatory conduct because, when Evans asked him more about why Davis reminded Evans of her, the co-worker said that Davis "stirred up trouble." But a one-time inappropriate comment by Evans' peer does not create a genuine issue of material fact about a materially adverse retaliatory act by IPC. The Supreme Court has held that "[a]n

17

employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington,* 548 U.S. at 68.

Last, Evans claims that, in response to her complaints, she generally was treated worse than white employees, by being ignored and left out of meetings. But these general complaints are also not enough to create a genuine issue of material fact. Evans must offer evidence of an actual retaliatory act that meets the "materially adverse" standard. She has not done so.

For the foregoing reasons, we find that Evans failed to present evidence that creates a genuine issue of material fact regarding her retaliation claim. Thus, we affirm the district court's dismissal of this claim.

C.

Evans' last cause of action alleges that she was paid less than male employees in violation of the EPA. "The EPA prohibits gender-based discrimination by employers resulting in unequal pay for equal work." *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018). To establish a prima facie case under the EPA, a plaintiff must demonstrate: (1) the employer paid different wages to an employee of the opposite sex, (2) for equal work on jobs requiring equal skill, effort, and responsibility, which jobs (3) all are performed under similar working conditions. *Id.*[6] Generally, it is not enough to simply show that the

---

[6] The EPA burden-shifting framework is different from the *McDonnell Douglas* burden-shifting framework used in Title VII claims. *Md. Ins. Admin.*, 879 F.3d at 120 n.6. Once a plaintiff establishes a prima facie case of discrimination under the EPA, the burdens (Continued)

18

comparators hold the same title and the same general responsibility as the plaintiff. *See Spencer v. Virginia State Univ.*, 919 F.3d 199, 204 (4th Cir. 2019); *Wheatley v. Wicomico Cty., Maryland*, 390 F.3d 328, 332–33 (4th Cir. 2004). They must have virtually identical jobs. *Wheatley,* 390 F.3d at 333. The district judge held that Evans failed to establish a prima facie case of an EPA violation because she did not show a proper male comparator. We agree.

Evans lists seven individuals as her male comparators. Yet she failed to produce evidence that these comparators received higher salaries for performing jobs of the "effort, skill, and responsibility" as Evans' job.[7] Thus, we find that Evans failed to offer evidence that creates a genuine issue of material fact concerning her alleged EPA violation.

IV.

For the reasons set forth above, the ruling of the district court is

*AFFIRMED.*

---

of production and persuasion shift to the defendant-employer to show that the wage differential was justified by one of the statutory defenses. *Id.* at 120. If the employer fails to establish one or more of the defenses, the plaintiff will prevail. *Id.*

[7] From her briefs, Evans' chief complaint on the EPA claim seems to be that the magistrate judge denied a motion to compel that might have provided the necessary evidence. However, that decision is not before this Court and we thus decline to address it.