PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Plaintiff-Appellant,*

v.

XERXES CORPORATION,

*Defendant-Appellee.*

No. 10-1156

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(1:08-cv-01882-CCB)

Argued: December 9, 2010

Decided: April 26, 2011

Before TRAXLER, Chief Judge, and
WILKINSON and MOTZ, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published
opinion. Chief Judge Traxler wrote the opinion, in which
Judge Wilkinson and Judge Motz joined. Judge Wilkinson
and Judge Motz each wrote a separate concurring opinion.

## COUNSEL

**ARGUED:** Elizabeth Ellen Theran, EQUAL EMPLOY-
MENT OPPORTUNITY COMMISSION, Washington, D.C.,

for Appellant. Robert C. Castle, OPPENHEIMER WOLFF & DONNELLY LLP, Minneapolis, Minnesota, for Appellee. **ON BRIEF:** P. David Lopez, General Counsel, Carolyn L. Wheeler, Acting Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant. Aaron Mills Scott, OPPENHEIMER WOLFF & DONNELLY LLP, Minneapolis, Minnesota, for Appellee.

## OPINION

TRAXLER, Chief Judge:

This appeal arises from an action brought by the Equal Employment Opportunity Commission ("EEOC") on behalf of Albert Bernard Pearson, Keith Wilson, and Gradian Graham, present or former African-American employees of Xerxes Corporation ("Xerxes"), alleging a hostile work environment on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"). The district court granted summary judgment for Xerxes. We affirm in part, vacate in part, and remand.

I.

A.

Xerxes is a fiberglass tank manufacturer based in Minneapolis, Minnesota. Pearson, Wilson, and Graham worked as assemblers at Xerxes' plant in Williamsport, Maryland. Bob Shifflett was their shift supervisor. He reported to plant superintendent Greg Carty, who reported to plant manager Wayne Green.

At all times, Xerxes had in place a comprehensive Corporate Compliance Program and Program Guide, prohibiting

discrimination and harassment in the plant. Plant employees were instructed to report any violations to their "supervisor, Plant Manager, . . . or a member of Xerxes' Compliance Committee." J.A. 487, 493. In addition, as of at least January 9, 2006, Xerxes also had in place a separate anti-harassment policy, which prohibited "Sexual, Racial and Other Objectionable Conduct or Unlawful Harassment." J.A. 480. The policy provided specific examples of prohibited conduct and, among other directions, instructed plant employees to "*Immediately* Report The Incident To Your Supervisor *And* Plant Manager." J.A. 481. All employees received copies of Xerxes' anti-harassment policies and were trained in them at the time of hire. Refresher training was conducted annually.

Xerxes and its nonsupervisory employees were also subject to a Collective Bargaining Agreement (the "CBA") between Xerxes and the United Automobile, Aerospace and Agricultural Implement Workers of America, Local No. 171 (the "Union"). The CBA prohibited "unlawful discrimination against employees on account of race, color, creed, national origin, religion, sex, sexual orientation, pregnancy, marital status, age, disability, or Union affiliation, or any other legally protected class status." J.A. 501. The CBA also protected Union employees from being "disciplined or discharged without just cause." J.A. 498. The CBA contained a grievance procedure for alleged violations, and Union representatives were regularly available to meet with employees about any concerns. The Union president testified that Xerxes took "a strong stance against discrimination," J.A. 307, and "seem[ed] to respond very quickly whenever there [were] allegations" of discrimination. J.A. 308.

## B.

Bernard Pearson was hired by Xerxes to work at the plant on a temporary basis in April 2005 and as a full-time employee in June 2005. He testified that from June 2005 until February 2006, his coworkers subjected him to repeated racial

slurs and pranks in the plant. He testified that Amber Gatrell used the word "n*****" in his presence on repeated occasions and referred to him as "Boy." He testified that Floyd Myers called him "Boy" and "black Polack," and called a white woman a "n***** lover." He also testified that unknown coworkers occasionally played pranks on him, such as turning the lights off in the bathroom and throwing wet paper towels at him, placing gel on the doorknob in the bathroom so that he could not open the door, tampering with his toolbox lock, and hiding his toolbox. Pearson testified that he reported these incidents to Shifflett as they occurred, but that Shifflett did nothing until February 2006. He did not complain to any other members of management.

Keith Wilson was hired by Xerxes as a temporary employee in October 2005 and as a full-time employee in December 2005. He alleges that he was first subjected to racial harassment by his coworkers in November 2005. He testified that on two or three occasions someone stole or threw away his and Pearson's lunches. He also complained that Tammy Smith called him by racially-tinged names, including "Buckwheat," "Benson," and "Yellow Boy."[1] Wilson testified that he reported the incidents to Shifflett as they occurred, but did not complain to any other management employee because the Union representative told him he had to report them to his direct supervisor first.

On February 3, 2006, however, two related incidents involving Gatrell and Myers were reported to Shifflett and to Green. Wilson testified that while he was working with Gatrell, she said to him, "Boy you don't lay up no manway like that." J.A. 353. Wilson reported the incident to Shifflett and told Shifflett that "where I come from . . . boy is another

---

[1]Buckwheat and Benson are African-American characters in the television series "Little Rascals" and "Benson," respectively. We assume "Yellow Boy" is a reference to a mixed-race individual.

name for the N word." J.A. 353. Shifflett memorialized the complaint and his response in writing, as follows:

> [Gatrell] and [Wilson] were working [together and] it was at the end of the shift. [Wilson] started to take the dumpster up to dump it. [Gatrell] said to [Wilson] hey boy you can't dump the dumpster yet because its not 9:30 p.m. Later [Wilson] and [Pearson] came to me and said that they were tired of people saying boy to them and other racial slurs. I told [Wilson] and [Pearson] that no they don't have to listen to this and that it would be dealt with right away. I went to [Gatrell] and told her that I think the best thing to do is go to [Wilson] and say to him that if he took [o]ffense about her saying boy to him that she was sorry. The next day [Gatrell] talked to [Wilson] and [Pearson] in the parking lot and told [Wilson] just what I said to.

J.A. 641. Gatrell admitted using the term "boy," but claimed that she did not intend it to be racially offensive. Later that same evening, Myers exchanged words with Pearson and Wilson in the lunchroom and "said something like, yeah, Boy, well I'll see you outside." J.A. 354. Myers also admitted using the term "boy" during the exchange, but claimed that he did not intend it to be racially offensive. After Green met with Myers about the incident, Myers apologized to Pearson and Wilson. Green also held a meeting with the shift employees to review Xerxes' anti-harassment policies. Green reminded the employees that racial harassment, including race-based comments, was prohibited and warned that future misconduct would result in disciplinary action.

After February 2006, Wilson reported no further incidents of racial harassment until June 2007.[2] In May 2006, however,

---

[2]Although Wilson testified that "[i]t seemed like [it] just got worse[ ]" after the February 2006 meeting, J.A. 356, there is no evidence of any additional incidents or reports of racial harassment involving Wilson until June 2007.

Pearson complained to Shifflett that two different coworkers had referred to music being played in the plant as "jungle music" and "n**** music." Shifflett told Pearson that he should report the incidents to Carty. Carty, in turn, met with Pearson and the Union representative. At the meeting, Pearson also told Carty about the problems he had experienced with Gatrell and Myers, and told Carty that he "wanted it to stop." J.A. 548. Carty told Pearson not to say anything to anyone and that he would take care of it.

When Green learned of Pearson's complaint, he notified Xerxes' corporate office and Ronald Bachmeier, the EEO coordinator, traveled to the plant to investigate.[3] According to Bachmeier:

> While at the plant, I conducted a comprehensive investigation into Mr. Pearson's allegations. I interviewed Mr. Pearson as well as more than 15 other employees. Interviewees either denied Mr. Pearson's allegations, explained that Mr. Pearson had taken their remarks out of context, indicated that they did not mean their remarks to be racially offensive, or had since apologized for those remarks, and explained that Mr. Pearson had himself engaged in interaction with other employees using profanity and the racially offensive term "N_____." Neither Mr. Pearson nor any other employee attributed any racially offensive remarks to any Xerxes supervisor. Moreover, although Mr. Pearson contended that he had spoken with certain Xerxes supervisors regarding his concerns, those supervisors credibly disputed

---

[3]By this time, Pearson had also filed the Maryland Commission on Human Relations (MCHR) charge, which is dated June 15, 2006. There is no evidence in the record on appeal as to when Xerxes became aware of the charge, nor are the exact dates of the other events during this time period clear. The best that can be determined is that Pearson complained to Shifflett and Carty sometime in May and that Green requested assistance from the corporate office in late June.

> Mr. Pearson's contention that he spoke to them or
> Mr. Pearson's version of their communications.

J.A. 474-75.

At the conclusion of the investigation, the following actions were taken by Xerxes. Myers and Gatrell were each issued two-day unpaid suspensions from work and required to attend refresher training in the anti-harassment policies. They were also "placed on a final warning" that Xerxes "w[ould] terminate [their] employment if [it was] ever determine[d] that [they] engaged, directly or indirectly, in hostile, offensive, or otherwise unlawful conduct toward any Xerxes employee." J.A. 646. They were also instructed as follows:

> You are under no circumstances to have any hostile, offensive, or otherwise unlawful interaction with [Pearson]. You shall not make any racially hostile, offensive, or intimidating remarks, gestures, or engage in any conduct, of any type, which is racially offensive. This prohibition applies to our entire Plant, including Plant production areas, break areas, lunchroom, restrooms, and parking lot.

J.A. 646.

Bachmeier determined that coworker Brian Bradley "had referred to certain music as 'jungle music,'" but that he "had not made the remark with intent to disparage any employee's race," and had apologized to Pearson and another employee. J.A. 476. Bradley was issued a "Written Disciplinary Warning" and also required to attend refresher training. J.A. 477. He was warned not to "engage in prohibited discrimination, harassment, or objectionable conduct" to any employee or "make any racially hostile, offensive, or intimidating remarks, gestures, or engage in any conduct, of any type, which is racially offensive." J.A. 650-51. He was also warned that future misconduct would "subject[ ] [him] to further disci-

pline, up to and including the termination of [his] employ-
ment." J.A. 651.

During his investigation of Pearson's complaint, Bachmeier
also learned that coworker Tammy Smith "had used the term
'Buckwheat,' in the context of a conversation with another
African-American employee," but determined that her use of
the name was related to a television show and that she had
"credibly denied that she intended the remark to be in any
way racially derogatory." J.A. 477. "In light of the nature of
her remark, her explanation, and her credibility regarding the
use and context in which she made the remark," Smith was
provided a "verbal counseling remind[ing] [her] of her obliga-
tion to comply with Xerxes . . . policies," and required to
attend refresher training. J.A. 477. Smith was also warned that
violations of the harassment policies would result in appropri-
ate disciplinary action in the future.[4]

Finally, Bachmeier conducted refresher training of *all*
employees regarding Xerxes' EEO and anti-harassment poli-
cies. This included a review of employees' "options for
reporting incidents to Xerxes' EEO Coordinator or Corporate
Compliance Committee to facilitate a response by the com-
pany." J.A. 478. In a separate session, Bachmeier retrained
the supervisory personnel as well, including "their responsi-
bilities with respect to the promotion of a work environment
in which all employees are treated lawfully, with dignity and
respect." J.A. 477. Pearson was provided a memorandum
summarizing Xerxes' investigation and response to his com-
plaint, and thanking him for coming forward. Pearson with-
drew his MCHR charge and there were no further reports of

---

[4]As noted above, Wilson testified that he complained about Smith to
Shifflett prior to February 2006, but there is no evidence that he ever com-
plained to Carty, Green or Bachmeier. We presume that Bachmeier
learned of Smith's use of the "Buckwheat" name while investigating Pear-
son's complaints and that the other African-American employee was Wil-
son.

harassment at the Xerxes plant until April 2007, nearly a full year later.

### C.

On April 10, 2007, Pearson found a 4" x 4" piece of fiber-glass in his locker with the following message on it: "KKK plans could result in death, serious personal injury, NIGGA BENARd." J.A. 639. Pearson reported the incident to the Union representative and Green, and Xerxes promptly began an investigation.[5] Pearson also reported the incident to the EEOC. Unfortunately, Pearson could not identify the culprit, nor name any particular suspect. Xerxes was also unable to determine who was responsible.

On April 20, 2007, Green reported the incident to the local Sheriff's Office. Three days later, Green held a plant meeting with all employees. At this meeting, Green warned the employees that the act was inappropriate and unacceptable, that Xerxes had requested a full police investigation, and that anyone with information about the incident was expected to come forward. The employees were advised that Xerxes "would take immediate and appropriate discipline, which in all likelihood, would result in termination" should Xerxes or the police find the person responsible for the act, and that Xerxes would encourage criminal prosecution if available. J.A. 525. Xerxes also posted a notice in the plant to the same effect.

On April 26, 2007, Sheriff's Deputy Grimm responded to the plant's request to investigate the incident. Green advised

---

[5]There is some dispute regarding Pearson's report of this incident to Green. Pearson testified that he and the Union representative went directly to Green, but that Green was busy and asked them to return the next day. Green claims that Pearson would only say that he found something in his locker and that he was going to contact an attorney. However, it is undisputed that, within a few days, Pearson allowed Green to photograph the item and cooperated in the investigation.

Deputy Grimm that Pearson had "reported racial remarks in the past by fellow employees, but they were handled internally through human resources and none ever contained any reference to the 'KKK'." J.A. 465. Pearson also told Deputy Grimm that he could identify "no particular person [as a suspect] but stated there were [cliques] in the workplace and a number of people could be responsible." J.A. 466. The Sheriff's Office was unable to determine who was responsible and advised Pearson to report any further incidents.

After the April 2007 incident, Green periodically checked on Pearson to see if he had experienced any further problems. On June 1, during one such inquiry, Pearson told Green that someone had put resin on his toolbox lock, but that nothing else had happened. Pearson told Green that he did not know who played the prank, but he thought there were still a few people "play[ing] games with him." J.A. 653. Green told Pearson that Xerxes would get him a replacement lock and reminded Pearson to immediately report such incidents. Green also assured Pearson that "the training [had been done] many times and everyone knows what they are supposed to do and not do so if someone is still playing games we will catch them and we will deal with it strongly." J.A. 653.

On June 11, 2007, Wilson discovered a small, stick-figure drawing depicting a person hanging by a noose and the phrase "IH IH MY N*****." J.A. 640. Several days later, Wilson reported the incident to Shifflett, who made a copy of the drawing and notified Green. Wilson reported the incident to the EEOC as well. Green met with Wilson, reported the incident to the Sheriffs' Office, and notified the corporate office. When Mike Zais, Xerxes' EEO Coordinator at that time, learned of the incident, he also traveled to the plant to investigate and interview employees. Unfortunately, the person responsible for this incident was also never identified.[6]

---

[6]Wilson did not immediately report the drawing to Xerxes. He reported the incident to his Union representative, who suggested several days later

On August 30, 2007, Zais summarized Xerxes' response to the complaints of racial harassment in a memorandum to Wilson. Zais advised Wilson that "in response to [his] concern and [those] of two other employees," a number of steps had been taken "in order to make sure that [Xerxes] maintain[s] a workplace free of discrimination and harassment." J.A. 455. This included (1) an internal investigation and employee interviews; (2) enlisting the assistance of the local Sheriff's Office; (3) retraining of all supervisors; (4) disciplining three employees who Xerxes had concluded had violated the prohibition against discrimination and harassment; (5) posting notices reminding the employees of the standards of conduct and prohibition of harassment; (6) advising the Union that Xerxes "will not tolerate racial discrimination or harassment, and that Xerxes will respond to such conduct with strong discipline, including the termination of employees when appropriate"; and (7) discussing with individual employees situations in which they may have unintentionally offended other employees. J.A. 456.

With regard to the sketch itself, Zais assured Wilson that "Xerxes is both highly offended by and absolutely opposed to such a communication" and that "[i]f we are able to determine who created that communication, and if that person is an employee, Xerxes will in all likelihood terminate their employment." J.A. 456. Wilson was asked to "immediately notify" Xerxes if he "learn[ed] of information that would allow [Xerxes] to identify who created that communication."

---

that he contact the NAACP. Wilson then took the paper home over the weekend to consult with his pastor, who was also a local NAACP officer. At his pastor's recommendation, Wilson reported the incident to Shifflett the following week. There is no way to know when the paper was put into Wilson's locker. Wilson testified that he "had a whole bunch of papers in" his locker and that "a couple papers dropped out" when he opened it. J.A. 358. He threw the papers back into the locker, but decided to clean them out the next day. While doing so, "a little [folded] paper dropped back on the floor," which he discovered contained the drawing. J.A. 358.

J.A. 456. Wilson testified that he did not know what Xerxes could have done to discover who created the drawing.

At the time of this appeal, Wilson was still employed at the Xerxes plant and, with the exception of an isolated comment allegedly made by Tammy Smith in August 2008, discussed *infra*, he reported no further incidents of racial harassment after June 2007. Pearson also reported no further incidents of racial harassment after June 2007. He voluntarily resigned from Xerxes in February 2008, in order to take a position at a correctional facility. Prior to leaving, Pearson left a message with Green indicating his desire to return to Xerxes if his new position did not work out. The only violation of the anti-harassment policy that was reported occurred in August 2007. It involved a racial "joke" told by a white employee to two other white employees. After unsuccessfully attempting to stop their coworker, the two employees reported the incident to Xerxes management and the offending party was immediately terminated with the support of the Union.

D.

Gradian Graham was employed by Xerxes from August 2004 until April 2007. Graham testified that during the first two weeks of his employment, coemployee Bob Churchey did a poor job of training him and encouraged Shifflett to fire him. After these two weeks, Shifflett reassigned Graham to Carolyn Reed to complete his training. Graham also testified that Churchey "used the N word a bunch of different times" during his employment. J.A. 103. When asked for details, however, Graham could only state that Churchey had used the N word on "[n]ot one occasion," but he could not "say the exact dates of these." J.A. 104. His "best recollection" was that "[i]t was [during his] time of employment at Xerxes." J.A. 105. Graham testified that he complained about Chur-

chey to Shifflett and Carty, but was likewise unable to recall any details about these alleged complaints.[7]

Graham's remaining complaints pertain to Shifflett. On January 19, 2007, Shifflett told Carty that he was having a recurring problem with Graham coming to work without the key to his lock. When Carty met with Graham about Shifflett's concerns, Graham claimed that Shifflett did not like him because he was black. Carty immediately requested a meeting with the Union representative and Green. Graham's only complaint at this meeting, however, was that Shifflett "stare[d] at [him] strangely," which Green found insufficient to support a charge of racial discrimination. J.A. 612. On January 30, 2007, Graham told Carty that Shifflett had looked under the restroom stall at him and that this incident was witnessed by a coemployee, Tony Yung. Again, the complaint was immediately investigated by Green. Yung told Green that Shifflett had entered the bathroom the previous day, but had simply looked at the sink and walked out. Yung denied that Shifflett had looked under the stall at Graham. According to Green, Graham then changed his story and claimed that Shifflett had looked at him through the cracks in the stall door, which was also contrary to Yung's account. Graham denies changing his story and maintains that Shifflett looked under the stall door at him. Green concluded that Graham's complaint was not been made in good faith and, because Graham had a documented written warning and recent incident of insubordination, issued Graham a final warning.

On April 18, 2007, however, Graham was instead terminated for excessive absenteeism after receiving several disciplinary warnings for attendance. Graham testified that he had been having personal and financial problems that interfered

---

[7]Graham also testified that he was followed from Xerxes by several men in a car in 2005, but the EEOC admits that there is no evidence that he reported this incident to Xerxes, nor is there any evidence that it was based on his race.

with his attendance and work. He never filed a grievance with the Union regarding racial discrimination, his disciplinary warnings, or his termination. He also never filed a charge with the EEOC regarding racial discrimination. The EEOC does not contend that Graham's termination is related to alleged racial harassment.

## II.

In July 2008, the EEOC initiated this action on behalf of Pearson, Wilson, "and a class of black individuals," alleging a hostile work environment. J.A. 7. Graham was identified as the only additional complainant during litigation.[8]

The district court granted summary judgment to Xerxes, based on its conclusion that Xerxes' responses to the reports of harassment were reasonable as a matter of law. Specifically, the district court held that "whenever Xerxes learned of harassment, it acted quickly and reasonably effectively to end it." J.A. 847. With regard to Graham, the district court noted its "doubts that the sporadic instances of harassment experienced by Mr. Graham would meet [the] threshold" of severe or pervasive harassment, J.A. 846, and held that Graham's complaints about Shifflett were not actionable because there was insufficient evidence that the incidents were based on race.

We review *de novo* the district court's grant of summary judgment to Xerxes, "viewing the facts in the light most favorable to, and drawing all reasonable inferences in favor of," the EEOC. *EEOC v. Central Wholesalers, Inc.*, 573 F.3d

---

[8]The only other African-American employee working in the assembly department during the time in question was Neville Haymans. Haymans began working at the plant on May 15, 2006, and became a permanent employee in July 2006. He testified that he never heard racial slurs or jokes in the plant, nor did he ever experience any racial discrimination or harassment.

167, 174 (4th Cir. 2009) (internal quotation marks omitted). Summary judgment is appropriate "if 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)).

## III.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Because "an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *Central Wholesalers*, 573 F.3d at 174 (internal quotation marks omitted).

To survive summary judgment on a claim of a racially hostile work environment, the EEOC "must demonstrate that a reasonable jury could find [the] harassment (1) unwelcome; (2) based on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001). In addition, the EEOC must present "sufficient evidence of a fourth element: that there is some basis for imposing liability" for the harassment on the employer. *Id.* at 184 (internal quotation marks omitted).

Where an employee has been harassed by a coworker, "the employer may be liable in negligence [under the fourth element] if it knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree v. Scollon Prods.*, 335 F.3d 325, 333-34 (4th Cir. 2003) (en banc); *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006). "Once the employer has notice, then it must respond with remedial action reasonably calculated to end the harassment." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir.

2008) (internal quotation marks omitted); *see also Mikels v. City of Durham*, 183 F.3d 323, 329 (4th Cir. 1999) ("[O]ur precedents ha[ve] long defined the basis for imposing liability under element (4) as being that after having acquired actual or constructive knowledge of the allegedly harassing conduct, the employer had taken '*no* prompt and adequate remedial action to correct it.'") (emphasis added and alteration omitted) (quoting *Spicer v. Commonwealth of Va., Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995) (en banc)).

"The institution and enforcement of [an anti-harassment] policy, in conjunction with an adequate complaint procedure, aid the employer in establishing that it has exercised reasonable care to prevent discrimination." *Spriggs*, 242 F.3d at 187 (internal quotation marks omitted). "However, the mere promulgation of an anti-harassment policy, no matter how well-conceived, will not suffice to show the requisite level of care where the employer has administered the policy in bad faith or has rendered it ineffectual by acting unreasonably." *Id.* (internal quotation marks omitted); *see also Sunbelt*, 521 F.3d at 320 ("While the adoption of an effective anti-harassment policy is an important factor in determining whether [an employer] exercised reasonable care, the policy must be effective in order to have meaningful value." (internal quotation marks omitted)).

In this case it is undisputed that Xerxes' anti-harassment policies "provide[d] reasonable procedures for victims to register complaints." *Ocheltree*, 335 F.3d at 334; *Howard*, 446 F.3d at 568. Thus, for purposes of the fourth element, we need only inquire as to whether the EEOC presented sufficient evidence to demonstrate that Xerxes' responses to the complaints made under its policies were not reasonably calculated to end the harassment and, therefore, that liability for the harassment may be imputed to it.

There is no "exhaustive list" or "particular combination" of remedial measures or steps that an employer need employ to

insulate itself from liability. *Central Wholesalers*, 573 F.3d at 178. Among other things, we have considered the promptness of the employer's investigation when complaints are made, whether offending employees were counseled or disciplined for their actions, and whether the employer's response was actually effective. However, the mere fact that harassment reoccurs in the workplace, either by the same offender or different offenders, does not, *ipso facto*, allow a jury to conclude that an employer's response was not reasonably calculated to end the harassment. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998). The cessation of "harassment shows effectiveness, which in turn evidences such reasonable calculation." *Id.*; *see also Mikels*, 183 F.3d at 330 (noting that we "have given great weight to the fact that a particular response was demonstrably adequate to cause cessation of the conduct in question"). But "this is not the sole factor to be considered. Because there is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist," *Adler*, 144 F.3d at 676, or, as in this case, harassment reoccurs in the workplace. "A remedial action that effectively stops the harassment will be deemed adequate as a matter of law. On the other hand, it is possible that an action that proves to be ineffective in stopping the harassment may nevertheless be found reasonably calculated to prevent future harassment and therefore adequate . . . as a matter of law." *Knabe v. Boury Corp.*, 114 F.3d 407, 411-12 n.8 (3d Cir. 1997). In such cases,

> [courts] consider the timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the response was proportional to the seriousness and frequency of the harassment. . . . By way of example, responses that have been held reasonable have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral or written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could

result in progressive discipline, including suspension and termination.

The employer is, of course, obliged to respond to any repeat conduct; and whether the next employer response is reasonable may very well depend upon whether the employer progressively stiffens its discipline, or vainly hopes that no response, or the same response as before, will be effective. Repeat conduct may show the unreasonableness of prior responses. On the other hand, an employer is not liable, although [harassment] persists, so long as each response was reasonable. It follows that an employer is not required to terminate a [particular] perpetrator except where termination is the only response that would be reasonably calculated to end the harassment.

*Adler*, 144 F.3d at 676-77 (10th Cir. 1998) (citations omitted); *see also Central Wholesalers*, 573 F.3d at 178 (noting that we also consider whether the employer took "increasingly progressive measures to address the harassment when its [initial] responses proved ineffective").

## IV.

We begin with the district court's grant of summary judgment on the hostile work environment claims advanced by the EEOC on behalf of Pearson and Wilson. The EEOC contends that the district court erred in granting summary judgment to Xerxes as to these claims because a reasonable jury could find (1) that Xerxes was placed on actual notice of racial harassment by coworkers of Pearson in June 2005 and of Wilson in November 2005, when they first complained to Shifflett, respectively; (2) that Xerxes failed to respond to their complaints at all until February 2006; and (3) that Xerxes failed to respond to their complaints thereafter with remedial action reasonably calculated to end the harassment.

A.

Viewing the evidence in the light most favorable to the EEOC, we conclude that a genuine issue of material fact exists as to whether Xerxes had notice of the alleged racial slurs and pranks in the workplace prior to February 2006, but failed to respond with any remedial action.

Pearson and Wilson each testified that prior to February 2006, they were subjected to the repeated use of racial slurs by Gatrell and Myers, as well as to various pranks by unknown coworkers that they believed were racially motivated. In addition, Wilson testified that Tammy Smith used racially-tinged names when addressing him. If the facts are as asserted by Pearson and Wilson, they would constitute racial harassment sufficient to "alter the conditions of employment and create an abusive atmosphere." *Spriggs*, 242 F.3d at 183-84. The men also testified that they first reported this harassment to Shifflett in June 2005 and November 2005, respectively, and continued as the incidents occurred thereafter, up to and including the complaints they made on February 3, 2006 about Gatrell and Myers. However, Xerxes did nothing in response to their complaints until February 2006.

At the time of the prior complaints, Xerxes' Compliance Program Guide advised employees that they "may report a violation [of the Program] by approaching or telephoning [their] supervisor, Plant Manager, . . . *or* a member of Xerxes' Compliance Committee, as the circumstances dictate." J.A. 487 (emphasis added). As the direct supervisor of Pearson and Wilson, therefore, Shifflett was specifically designated as an appropriate person to receive such complaints.

Xerxes disputes that complaints of racial harassment were made to Shifflett prior to the February 3, 2006 incident with Gatrell and Myers, but a jury could reasonably credit the testimony of Pearson and Wilson and conclude otherwise. Accordingly, we hold that a reasonable juror could find that

the complaints by Pearson and Wilson to Shifflett prior to February 2006 were sufficient to place Xerxes on actual notice of the racial slurs and pranks in the plant and that Xerxes' response was unreasonable. Accordingly, we vacate the district court's award of summary judgment for any alleged racial harassment of Pearson and Wilson occurring before February 2006, and we remand for further proceedings as to this time period.

## B.

With regard to the incidents of racial harassment that were reported on February 3, 2006 and beyond, however, we hold that Xerxes' response to each reported incident was reasonably calculated to end the harassment and, therefore, reasonable as a matter of law. Accordingly, we affirm the district court's award of summary judgment for the alleged racial harassment as to this time period.

### 1.

As of February 2006, Xerxes had in place extensive anti-harassment policies consistent with Title VII that directed plant employees to immediately report any racial harassment to their supervisor *and* the plant manager. The employees were assured that their complaints would be promptly investigated and that appropriate remedial action would be taken.

On February 3, 2006, when Shifflett and Green were made aware of the incident involving Gatrell and Myers, Xerxes' response was prompt and proportional to the seriousness of the offense. Gatrell and Myers were individually counseled and they apologized. In addition, Green held a meeting with the shift employees to review Xerxes' anti-harassment policies and warn that future misconduct would result in disciplinary action. The fact that formal disciplinary action, such as suspension or termination, was not taken against Gatrell and Myers at that time is an insufficient basis for concluding

that Xerxes' response was unreasonable. *See Knabe*, 114 F.3d at 414 ("[T]aking punitive action against [a] harassing employee, e.g., reprimand, suspension or dismissal, is not necessary to insulate the employee from liability for a hostile work environment. So long as the remedy is reasonably calculated to prevent future instances of harassment, the company cannot be held liable.") (footnote omitted). As the EEOC has argued, Green apparently believed that, because Gatrell and Myers had apologized and the anti-harassment training had been reinforced, they would not continue to use offensive language in the workplace. His assumption was correct. While Myers and Gatrell were disciplined for their prior conduct in July 2006, there is no evidence that either of them engaged in acts of racial harassment after February 3, 2006.

In May 2006, Pearson complained to Shifflett and Carty about *other* coworkers using racially-offensive terms to describe music being played in the plant. Pearson also told Carty about his previous problems with Myers and Gatrell, and told Carty that he wanted the racial slurs to stop. When Green learned of Pearson's complaint, he notified the corporate office, and an escalated response ensued. Bachmeier immediately traveled to the plant to conduct a formal investigation and employee interviews. At the conclusion of the investigation, Xerxes imposed written disciplinary action upon Myers and Gatrell, including two-day unpaid suspensions from work, and issued a final, written warning that any future violations of the anti-harassment policies would result in their termination. Bradley received a written disciplinary warning for his use of a racially-offensive term to describe music, and he was advised that he faced possible termination for future violations as well. Tammy Smith was verbally counseled for her use of a racial nickname during her conversation with another African-American employee, presumably Wilson. In addition, Bachmeier conducted refresher training of all supervisory and nonsupervisory employees in their respective obligations under Xerxes' anti-harassment policies.

In sum, Xerxes' response to the complaints of racial harassment in 2006, taken in consultation with the Union representatives for the victims *and* the accused, was prompt, proportional to the seriousness and frequency of the various offenses, and employed "increasingly progressive measures to address the harassment" that had occurred in the workplace. *Central Wholesalers*, 573 F.3d at 178; *see Adler*, 144 F.3d at 676. This included employee counseling and disciplinary action, suspensions of two employees, and warnings that future misconduct could result in progressive discipline, up to and including termination. It was not only "reasonably calculated to end the harassment" as a matter of law, *Sunbelt*, 521 F.3d at 319 (internal quotation marks omitted), it was actually effective. There were no reported incidents of racial slurs for over two years, and no incidents of pranks for nearly a year thereafter.[9]

2.

In April and June 2007, Pearson and Wilson each found an anonymous, racially-charged message in his locker. The messages were unquestionably abhorrent. However, they were of a much different character than the racial slurs and pranks that had been the subject of the complaints the previous year. There was no reason to believe that the employees disciplined in 2006 were involved in the incidents in 2007. And the EEOC failed to present any evidence that the two incidents occurred because the disciplinary action and training implemented in response to the 2006 complaints were inadequate.

Xerxes' response to these new incidents was also prompt and reasonably calculated to put a stop to any further such

---

[9]This conclusion is also supported by the testimony of Haymans who, as noted earlier, began his employment in the Assembly Department on May 15, 2006, about the time of Pearson's complaint to Carty. He testified that he *never* heard racial slurs or experienced racial harassment in the workplace.

activity in the workplace. Indeed, we can think of nothing further that Xerxes could have done to convey to the perpetrators how seriously Xerxes viewed these incidents and how aggressively it would pursue disciplinary action if it succeeded in identifying the culprits. In addition to conducting internal investigations, Xerxes reported the incidents to the local Sheriff's Office. Green held a plant-wide meeting and notified all employees (which would, of course, have included the perpetrators if they were employees) that law enforcement had been notified and a full investigation requested. The employees were advised that anyone with information was "*expect[ed]* to come forward," J.A. 525 (emphasis added), and they were warned that the perpetrators, if identified, would face probable termination and possible criminal prosecution.[10]

Xerxes' EEO Coordinator also traveled to the plant to personally investigate the incidents, interview employees, and review the company's efforts to address the situation. In the meantime, Green routinely checked on Pearson to ensure that he was experiencing no further incidents of racial harassment and, if he was, that Xerxes was being made aware of them. It was through this proactive enforcement of Xerxes' anti-harassment policy that Green learned of the single, but also anonymous, toolbox prank that occurred in the midst of the two locker incidents. Green assured Pearson that the training had been done and that Xerxes would continue to respond aggressively to known offenders, and reminded him to immediately report any such violations to him.

---

[10]Xerxes' Compliance Program Guide provides that "failing to report or condoning a violation of the law, the principles contained in th[e] compliance guide or Xerxes' Compliance Program will lead to disciplinary action up to and including termination." J.A. 493. In addition, the anti-harassment policy informs employees that they "Must" report any harassment that they "Have Been Subjected To Or Have Observed," J.A. 481, and the CBA requires Union employees to report violations of the CBA to their Union representatives.

For their part, neither Pearson nor Wilson offered any suggestions of additional steps Xerxes should have taken to identify the perpetrators or otherwise respond in a more reasonable or effective manner. And the EEOC, in response to Xerxes' interrogatory asking it to "identify all actions that [Xerxes] should have taken but did not that would have demonstrated an exercise of reasonable care to prevent and correct promptly racial harassment or race discrimination," responded simply that Xerxes "ha[d] not effectively stopped or prevented racial harassment in its workplace." J.A. 719. That, however, is not the standard for imputing liability on Xerxes.

We conclude that Xerxes' response in 2007 was also "reasonably calculated to end the harassment" as a matter of law, *Sunbelt*, 521 F.3d at 319 (internal quotation marks omitted), and that it was effective in doing so. No further racially-charged threats or workplace pranks occurred after Xerxes' response. The single reported violation of Xerxes' anti-harassment policy was the racial joke that was told by a white coworker in August 2007, which resulted in the employees reporting the offense in accordance with the anti-harassment policies and the offending employee being fired.

3.

Finally, the EEOC claims that, despite this demonstrable effectiveness, a reasonable jury could find that Xerxes' responses in 2006 and 2007 were unreasonable based upon Pearson's testimony that he was subjected to two isolated racial slurs in August 2007, and Wilson's testimony that he was subjected to a single racial slur in August 2008.

Pearson testified that in August 2007, coworker Sam Crone referred to African-American women as "nappy headed hos," and Tammy Smith told him that he looked like "Curious George" as he was climbing a ladder. Pearson did not, however, report these alleged incidents to Xerxes at the time and he resigned a few months later. Accordingly, Xerxes was

given no opportunity to investigate the complaints or respond appropriately.

Wilson testified that, in August 2008, after this lawsuit was filed, Tammy Smith said to him, "I hope this does not offend you, but I'm not trying to be nobody's white n*****," as she was cleaning up a work area. J.A. 376. Wilson claims that he reported the comment to Shifflett, but does not claim that he reported it to Green or any other management employee as he had been instructed. Xerxes contends that it first learned of the alleged incident several weeks later, when the EEOC attorney reported it to Xerxes' attorney. When Green investigated the claim, he was unable to corroborate it. Wilson advised Green that there were no witnesses to Smith's alleged statement. Smith "absolutely denie[d] having made the statement" and "state[d] that she never used the N_____ word" to Wilson. J.A. 459 (internal quotation marks omitted). Wilson also claimed that he reported the incident to the Union representative, but the Union representative told Green that he thought he heard it "'through the grapevine.'" J.A. 459. Accordingly, Green notified Wilson that he had been unable to substantiate the allegation and took no further action.

The EEOC makes much of these alleged, albeit isolated, racial remarks, particularly the unreported and uncorroborated accusations against Smith, as evidence from which a jury could reasonably conclude that Xerxes' previous disciplinary action against her and the others was unreasonable. We disagree.

As an initial premise, we note that "an employer *cannot* be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists" under its reasonable procedures. *Howard*, 446 F.3d at 567 (emphasis added). Thus, "employee[s] claiming harassment by a coworker bear[ ] significant responsibility in notifying the employer." *Id.* at 570; *see Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001) (noting that

"[l]ittle can be done to correct [harassing] behavior unless the victim first blows the whistle on it"). Here, both Pearson and Wilson inexplicably failed to avail themselves of Xerxes' available procedures to report these additional instances of racial slurs in the workplace, procedures of which they were undeniably aware and had effectively used in the past.

Even if the alleged racial slurs by Smith had been properly reported, however, this would be an insufficient basis upon which to conclude that Xerxes' discipline of Smith or the others in 2006 was too light to be reasonable. Plaintiffs often feel that their employer "could have done more to remedy the adverse effects of the employee's conduct. But Title VII requires only that the employer take steps reasonably likely to stop the harassment." *Knabe*, 114 F.3d at 414 (internal quotation marks and alteration omitted). The standard "in no way requires an employer to dispense with fair procedures for those accused or to discharge every alleged harasser. And a good faith investigation of alleged harassment may satisfy the . . . standard, even if the investigation turns up no evidence of harassment. Such an employer may avoid liability even if a jury later concludes that in fact harassment occurred." *Harris v. L&L Wings, Inc.*, 132 F.3d 978, 984 (4th Cir. 1997) (internal quotation marks and citation omitted); *see also Adler*, 144 F.3d at 677 ("The courts . . . must balance the victim's rights, the employer's rights, and the alleged harasser's rights. If our rule were to call for excessive discipline, employers would inevitably face claims from the other direction of violations of due process rights and wrongful termination.")

This principle finds particular significance in this case, where Xerxes bore responsibility to investigate its employees' complaints of racial harassment by their coworkers *and* an obligation to fairly investigate and only discipline offending coworkers, including Smith, in a manner consistent with the protections the Union afforded to all nonsupervisory employees in the workplace. As the district court aptly noted below,

"[g]iven Xerxes' collective bargaining agreement with the employees' union, it is difficult to imagine what further steps Xerxes might have taken to discipline [its] employees or to prevent future instances of harassment." J.A. 850.

4.

In the end, the crux of the EEOC's claim on appeal is the same as its answer to Xerxes' interrogatory at the outset of this litigation: that a reasonable jury could conclude that Xerxes' response to the reports of harassment in the workplace was not "reasonably calculated to end the harassment," *Central Wholesalers*, 573 F.3d at 177 (internal quotation marks omitted), because subsequent incidents of harassment, albeit isolated and temporally distant, occurred. This, however, is but a variation of strict liability, which employers do not bear for claims of coworker harassment. *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1148 (10th Cir. 2008) ("Because there is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist.") (internal quotation marks omitted); *Adler*, 144 F.3d at 676 ("[A]n employer is not liable, although a perpetrator persists, so long as each response was reasonable.").

"While employers can and should be required to adopt reasonable policies aimed at preventing illegal conduct and to take reasonable measures to enforce these policies, they cannot be held to a standard under which they are liable for any and all inappropriate conduct of their employees." *Spicer*, 66 F.3d at 711. "Employers cannot be saddled with the insurmountable task of conforming all employee conduct at all times to the dictates of Title VII, irrespective of their knowledge of such conduct or the remedial measures taken in response to such conduct." *Id.* So long as the employer's response to each known incident of coworker harassment is reasonably prompt, and the employer takes remedial measures

that are reasonably calculated to end the harassment, liability may not be imputed to the employer as a matter of law.

Here, Xerxes' responses to each reported incident of harassment as of February 2006 were "prompt and either effective or proportional to the seriousness and frequency of the incidents, and therefore [they] were reasonably calculated to end the harassment." *Adler*, 144 F.3d at 677. When harassment reoccurred, Xerxes "t[ook] increasingly progressive measures to address [it]." *Central Wholesalers*, 573 F.3d at 178. Where the alleged offenders were known and the offenses could be corroborated, Xerxes took disciplinary action, in the form of counseling, written reprimands, final warnings, suspensions, and, in one instance, termination, and conducted refresher training of the workforce in its anti-harassment policies. Where the perpetrators were unknown and could not be identified, Xerxes enlisted the assistance of the local police department and warned its entire workforce of the serious consequences that would ensue if the perpetrators were identified. Holding Xerxes "liable under these circumstances would be tantamount to imposing strict liability on an employer . . . regardless of the employer's . . . response," *Spicer*, 66 F.3d at 711, and "would make employers insurers against future [racial] harassment by coworkers after an initial employee response, regardless of the nature of the response taken. This is liability without end," *Adler*, 144 F.3d at 679.

Because the EEOC has failed to present sufficient evidence upon which a jury could find that Xerxes' responses to the reported incidents of racial harassment beginning in February 2006 were not reasonably calculated to end the harassment, liability for the subsequent, isolated acts of coworker harassment of Pearson and Wilson may not be imputed to Xerxes. Accordingly, we affirm the district court's award of summary judgment as it pertains to this time period.

V.

This brings us to the district court's grant of summary judgment to Xerxes on the racial harassment claims advanced by

the EEOC on behalf of Graham. In addition to granting summary judgment to Xerxes based upon its conclusion that Xerxes' responses to the reports of harassment were reasonable, the district court expressed doubt that Graham had satisfied the threshold requirement of demonstrating that he was subjected to severe or pervasive harassment, and held that there was insufficient evidence that Shifflett's alleged actions were based on race.

The determination of whether "race-based harassment was so severe or pervasive as to alter the conditions of" employment includes "both subjective and objective components." *Central Wholesalers*, 573 F.3d at 175. The employee must demonstrate that he "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." *Id.* "[W]hen determining whether the harassing conduct was objectively severe or pervasive, we must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Sunbelt*, 521 F.3d at 315 (internal quotation marks omitted).

The EEOC "'must clear a high bar in order to satisfy the severe or pervasive test.'" *Central Wholesalers*, 573 F.3d at 176 (internal quotation marks omitted). It "must show that the environment was pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere." *Id.* (internal quotation marks omitted). Thus, we have held that "conclusory statements, without specific evidentiary support, cannot support an actionable claim for harassment," *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998), and that allegations "[un]substantiated by accounts of specific dates, times or circumstances," are too "general" to suffice, *Carter v. Ball*, 33 F.3d 450, 461-62 (4th Cir. 1994).

Here, the EEOC has failed to present sufficient evidence upon which a jury could conclude that Graham was subjected

to a racially hostile work environment. Graham's testimony consists of general statements that Churchey used a racial slur "a bunch of different times," J.A. 103, and, later, that it was "[n]ot one occasion," J.A. 104. However, his "best recollection" was only that this occurred at some point during his "time of employment" at Xerxes, which spanned from August 2004 until April 2007. Graham's testimony is wholly unsupported by any detail, context, examples, or time frame. "Such [general] assertions, standing alone, are [simply] insufficient to sustain an actionable Title VII claim." *Gilliam v. South Carolina Dep't of Juvenile Justice*, 474 F.3d 134, 143 (4th Cir. 2007). Similarly, Graham's uncorroborated testimony that Churchey trained him poorly during the first two weeks of his employment, before he was reassigned to Carolyn Reed for training, is insufficient to establish a Title VII claim. There is insufficient evidence to show that Churchey's poor training of Graham was based on his race and insufficient evidence that Graham's "environment was [so] pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, [as to] creat[e] an abusive atmosphere." *Central Wholesalers*, 573 F.3d at 176 (internal quotation marks omitted).

Finally, we agree that Graham's allegations regarding Shifflett's conduct in January 2007 fail to support an actionable Title VII claim. Graham complains that Shifflett stared at him strangely and looked at him when he was in a bathroom stall. However, there is no evidence that Shifflett's actions, even if they occurred, were motivated by Graham's race, *see Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) (concluding that disputes with a supervisor, without evidence that harassment was racial in nature, were not enough to sustain summary judgment on hostile work environment claim), and Xerxes' responses to Graham's complaints about Shifflett were reasonable. Accordingly, we affirm the district court's grant of summary judgment for Xerxes as it pertains to Graham.

## VI.

Because there is a genuine issue of material fact as to whether Xerxes was on notice of racial harassment of Pearson and Wilson prior to February 2006, and took no action reasonably calculated to end the harassment, we vacate the district court's award of summary judgment as it pertains to that time period, and remand for further proceedings consistent with this opinion. The remainder of the district court's decision is affirmed.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

WILKINSON, Circuit Judge, concurring:

The undisguised ugliness of the incidents alleged here stands as a rebuke to complacency and a reminder that the task of racial reconciliation in our country remains incomplete. When judges speak of impermissible alterations of the terms and conditions of employment, what we mean is that no one should endure under law displays of racial bigotry at work.

The court is right to recognize that the company for the most part did not sit on its hands. As the district court has documented, Xerxes took the reports of rank prejudice in its midst quite seriously. I can hardly fault the able judge for believing that taken as a whole, the company's response was reasonably calculated to end the harassment. *See* J.A. 847 ("The record . . . reveals that whenever Xerxes learned of harassment, it acted quickly and reasonably effectively to end it.").

It is understandable, in one sense, for the EEOC to believe that the company should have done more — that, as the agency puts it, "Xerxes knew about the racial harassment of

all three class members but failed to take prompt or effective remedial action." Appellant's Br. at 31. Therein lies peril. To push employers to immediate and draconian actions is to dispense with any semblance of due process — to require disciplining the accused upon mere accusation. It is true the defendant here is not a state actor, but no entity — public or private — should be denied the leeway to sort out right from wrong.

There is a danger also, if the law requires too heavy an employer fist, that we stiffen interpersonal relationships; punish those inadvertent insensitivities that can arise even among persons of good will; and discourage the formation of friendships free of boundaries — the sole felicitous path upon which a decent people may proceed.

These hostile environment cases often defy hasty judgment. I write simply to commend the court for its good sense and balance — affirming in substantial part, but sending one claim back for a closer, further look. I am pleased to concur in its opinion. For every sad window such as this upon our daily lives, there is a hopeful one — unreported, unlitigated, but in its own way, a harbinger of happier times to come.

DIANA GRIBBON MOTZ, Circuit Judge, concurring:

In my view, the EEOC offered ample evidence of severe and pervasive racial harassment of two African-American employees—Bernard Pearson and Keith Wilson—by their co-workers. The conduct of the harassing co-workers was not just ugly, it was outrageous. The record is rife with testimony of racial slurs directed at Mr. Pearson and Mr. Wilson from at least six fellow Xerxes employees. The record also contains evidence that anonymous pranks were played on them and vile anonymous threats made to them. No one should be subjected to such abuse in the workplace. The panel opinion rightly concludes that the EEOC offered sufficient evidence

of severe and pervasive racial harassment in Xerxes's workplace to require a trial on that issue.

But not all workplace harassment—even harassment as severe and pervasive as that at issue here—imposes liability on the employer. Rather, "the EEOC must establish some basis for imposing liability" on the employer. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008).

If an employer's president or another management official "indisputably within that class of . . . officials who may be treated as the organization's proxy" had perpetrated this harassment, it would certainly be imputable to the employer. *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998). Moreover, we have held that when an employee perpetrates such harassment on a fellow employee, it will also be imputable to the employer—*provided* that the employer knew about the harassment and failed to "respond with remedial action reasonably calculated to end the harassment." *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 177 (4th Cir. 2009)(quoting *Sunbelt Rentals*, 521 F.3d at 319).

In this case, the EEOC does not contend high level officials of Xerxes management perpetrated the harassment. Rather, the EEOC's only contention is that fellow employees engaged in these dreadful acts of racial harassment. To render Xerxes responsible for its employees' actions, the EEOC must offer evidence that Xerxes failed to take remedial action calculated to end the harassment. For the period after February 2006, the panel holds that the EEOC has failed to offer such evidence.

In retrospect, I believe that more aggressive, early corrective action by Xerxes would have been well advised. However, although this is a very close case, it seems to me our precedent does not require Xerxes to undertake such action. For our precedent holds that an employer's "particular remedial responses" need not be the "most certainly effective that could be devised." *Mikels v. City of Durham, N.C.*, 183 F.3d

323, 330 (4th Cir. 1999); *see also Spicer v. Comm. of Va., Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995)(*en banc*)("[W]e have never suggested that an employer must make the most effective response possible . . . ."). Given this precedent, I think we must conclude that the EEOC failed to offer evidence that the remedial action undertaken by Xerxes, after February 2006, was inadequate.

Accordingly, I concur.