**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1498**

JOHN L. MCKINNEY, JR.,

       Plaintiff – Appellant,

    v.

G4S GOVERNMENT SOLUTIONS, INC.,

       Defendant – Appellee.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.  Elizabeth Kay Dillon, U.S. District Judge.  (7:14-cv-00101-EKD)

Argued: September 20, 2017           Decided: October 19, 2017

Before DUNCAN, DIAZ and THACKER, Circuit Judges.

Affirmed by unpublished opinion. Judge Duncan wrote the opinion, in which Judge Diaz and Judge Thacker joined.

ARGUED: Terry Neill Grimes, TERRY N. GRIMES, ESQ., P.C., Roanoke, Virginia, for Appellant.  Edward Gorham Phillips, KRAMER RAYSON LLP, Knoxville, Tennessee, for Appellee.  ON BRIEF: Brittany M. Haddox, TERRY N. GRIMES, ESQ., P.C., Roanoke, Virginia, for Appellant.  Brandon L. Morrow, KRAMER RAYSON LLP, Knoxville, Tennessee, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

Plaintiff-Appellant John L. McKinney, Jr., appeals the district court's grant of summary judgment to Defendant-Appellee G4S Government Solutions, Inc. ("G4S").[1] McKinney asserts that G4S created a hostile work environment and retaliated against him for reporting racial harassment in the workplace. He also asserts a claim for intentional infliction of emotional distress ("IIED"). The district court granted summary judgment in favor of G4S on all counts, finding no genuine dispute of material fact upon which a jury could find in McKinney's favor on any of his claims. The district court found that the undisputed facts established that G4S was not liable for creating a hostile work environment because it was entitled to the affirmative defense outlined in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), that no retaliation occurred because McKinney suffered no material adverse employment action, and that McKinney did not suffer severe emotional distress. Finding no reversible error, we affirm.

I.

In considering the grant of a motion for summary judgment, we view facts and the inferences drawn from them in the light most favorable to the nonmovant. *Pueschel v. Peters*, 577 F.3d 558, 563 (4th Cir. 2009). We therefore recite the facts as alleged by

---

[1] G4S is now Centerra Group, LLC.

McKinney or as otherwise established by the record. G4S hired McKinney in September 2005 to work as a Security Officer at the Radford Army Ammunition Plant (the "RFAAP"). RFAAP is operated by BAE Systems pursuant to a contract with the Department of Defense. BAE subcontracted with G4S to provide services at RFAAP including security, fire protection, copying and mail services, and janitorial services. McKinney is African-American.

G4S Senior Vice President Rich Allen oversees G4S's contract with BAE, which includes RFAAP and a sister facility in Tennessee. Allen is also African-American. Rob Handel works in G4S's human resources department. G4S's highest-ranking supervisor at RFAAP was Project Manager Shawn Lewis. Lewis reported to Allen, who reported to the president of G4S. During the relevant time period, J.C. Allison worked as the Security Chief, Greg Gravley worked as the Janitorial and Fleet Supervisor, and Ryan Gellner worked as the A Shift Captain.

In February 2012, McKinney was promoted to corporal (now called relief captain) and given a 16% raise. In September 2012, he was promoted to B Shift Captain, essentially the second shift, and given an additional 3.8% raise. In late May 2013 (after the May 23, 2013, events described below) he became the A Shift Captain, a position that McKinney prefers because of its normal hours, higher prestige, and greater responsibilities. McKinney remains employed in that position. He has not been demoted, and his salary has not been reduced since its increase in 2012.

McKinney recounts several racist incidents that have occurred during his tenure at G4S. In 2011, janitor Joe Roth used the n-word in McKinney's presence. In fall 2012,

4

fire chief Jay Altizer told McKinney that G4S had hired a "colored boy" as a firefighter. J.A. 665.[2]

The incidents of particular concern to McKinney occurred on May 23, 2013. McKinney observed Lewis, Allison, Gravley, and Gellner laughing in a common area near his office. After Allison, Gravley, and Gellner walked away, Lewis asked McKinney if he knew that there was a noose hanging on a nail inside a small closed cabinet outside the security captain's office. Lewis showed McKinney the noose and directed McKinney to get rid of it, over McKinney's objection. As McKinney was walking away with the noose, Roth walked by and said, "I know what to do with that. I can use that around my house." J.A. 690. Roth lives in a neighborhood with a large African-American population, and McKinney interpreted Roth's comment to refer to using the noose on his African-American neighbors.

Later that day, Lewis was standing on a ladder in the supply room when McKinney walked by. Lewis asked McKinney to come in and hold a box. McKinney had to get ready for his shift, and asked Gellner to hold the box for Lewis. As McKinney walked away, he heard Lewis and Gellner laughing. He walked back to the supply room, and saw Lewis standing on a ladder holding a white sheet over Gellner's head so that it formed a triangle-shaped cylinder that looked like a KKK hood. McKinney said "Really? . . . You-all don't have to do that to get me gone. Only thing you have to do is just tell

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

5

me." J.A. 401. Neither Lewis nor Gellner responded. Gellner later apologized and explained that he had nothing to do with the incident.

On May 24, 2013, Allison gave McKinney two "Employee Counseling" forms that cited McKinney for his failure to complete paperwork that McKinney claims others had agreed to complete. The counseling forms were dated May 23, 2013, and McKinney signed and dated them as such, even though he did not receive them until the following day. McKinney characterizes these as "bogus write-ups." J.A. 434.

G4S's policy prohibiting racial discrimination and harassment directed an employee to "immediately" report harassment to his "supervisor, a manager, or the Corporate Human Resources Department." J.A. 576. On May 24, 2013, *after* he received the two counseling forms, McKinney complained to Lieutenant Colonel Byron Penland, the highest-ranking Army officer at RFAAP, about both May 23, 2013, incidents, the two counseling forms Allison gave to him, and the existence of a "dope pipe" with a Confederate flag sticker in a case at RFAAP that displayed confiscated items. J.A. 110.

McKinney began recording his conversations with Lewis after the May 23, 2013, incident. He subsequently disclosed that he had over thirty hours of audio recordings from other conversations dating back to October 2012.

Allen visited RFAAP on May 31, 2013. Although McKinney made no attempt to talk to Allen, a receptionist informed Allen that McKinney was upset about an incident involving a noose and a white sheet, and that Lewis had been involved. Allen met McKinney and apologized, told McKinney that neither he nor the company tolerated such

6

conduct, and that there would be an investigation. Allen gave McKinney his card and personal cell phone number, and told McKinney to contact him if he had any concerns. Allen then called Handel to let him know that he would be recommending that Handel conduct an employee census at RFAAP to address concerns related to employee morale, ethics violations, and leadership issues. He also mentioned racial issues but did not provide any details as to McKinney's complaint.

Handel visited RFAAP from June 4–6, 2013, to conduct his census and meet with employees. At a meeting on June 4, 2013, he learned about the noose and hood incidents from Penland. He subsequently met with McKinney on June 6, 2013. Allen returned to RFAAP on June 11, 2013, and assured McKinney that there would be no retaliation for McKinney's report and that Handel would return to complete the investigation. Allen told Lewis, Allison, Gravley, and Gellner that Handel would conduct an investigation and that they were to treat McKinney with respect. McKinney alleges, however, that he was subsequently subject to retaliation: Lewis asked McKinney if he was going to quit; an unknown person dented his car and let the air out of his tires; Allison micromanaged him; and Allison, Gellner, and Gravely excluded him from meetings.

Handel returned on June 19, 2013, to meet with the individuals involved in the May 23, 2013, incidents. Lewis and Gellner denied that anything inappropriate was said or done with the folded canvas, and the four men involved in the noose incident denied laughing or making racist comments. Allison opined that McKinney's complaints might have been intended to cover up his performance issues.

Before Handel completed his investigation, Lewis was placed on administrative leave and then terminated. On June 17, 2013, BAE security manager Walker Suthers told Allen he wanted Lewis removed from the contract at RFAAP when a replacement could be found, and Allen began looking for one. On June 20, 2013, however, Suthers told Handel that McKinney had filed an EEOC charge and that BAE now wanted Lewis removed immediately. Lewis was placed on administrative leave, and terminated on June 28, 2013. Handel ultimately recommended that all security supervisors undergo sensitivity training.

McKinney acknowledges that he has not been subject to racial harassment since May 23, 2013.[3] Allen continued to check in with him, and McKinney's experience with Lewis's replacement has been positive.

II.

Summary judgment is appropriate when, as a matter of law, no reasonable jury could find for the nonmovant because there are no disputed genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or

---

[3] McKinney claims that other racist incidents occurred after May 23, 2013, but they did not affect him. In October 2014, janitor Kenneth Nunn used the n-word and referred to a white woman with interracial children as a "cakey-headed B-I-T-C-H." J.A. 789. Nunn was suspended for one day and told that he would be terminated if he made another similar comment.

unnecessary will not be counted." *Id.* at 248 (citation omitted). We review the district court's grant of summary judgment de novo, taking the facts in the light most favorable to McKinney, the nonmovant. *See id.* at 255.

McKinney asserts hostile work environment claims, retaliation claims, and an IIED claim. We address each in turn.

A.

Title VII of the Civil Rights Act of 1964 prohibits practices that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits the creation of a hostile work environment. *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 73 (1986) (hostile work environment sex discrimination actionable under Title VII).[4] An employer is strictly liable for a supervisor's harassment when the supervisor takes a tangible employment action, which is action that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

When no tangible employment action is taken, an employer may avoid liability by raising the *Faragher/Ellerth* affirmative defense. This defense requires "(a) that the

---

[4] McKinney asserts hostile work environment claims under Title VII and 42 U.S.C. § 1981, but the elements are the same under both statutes. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001).

employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 765; *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). For summary judgment purposes, G4S conceded that McKinney could establish a prima facie case of a racially hostile work environment. However, the district court concluded that G4S was entitled to the *Faragher/Ellerth* defense. We therefore consider whether its requirements are met.

We first address whether any tangible employment action was taken against McKinney. McKinney claims that the two counseling forms, his transfer to a new shift, "constant comments and negativity," and his exclusion from important meetings constitute tangible employment action.[5] Appellant's Br. at 21–24. However, none of these actions changed McKinney's salary, benefits, responsibilities at work, or employment status. In fact, the only changes to his employment status during this time were favorable: in 2012 he earned two raises, and in late May 2013 he earned a shift change *to his preferred shift*. McKinney's argument that he suffered when G4S made him the A Shift Captain because that role required more work for equal pay is

---

[5] McKinney also claims that he was constructively discharged, but that assertion is rebutted by his own authority: a constructive discharge plaintiff "must show that his or her employer deliberately made an employee's working conditions intolerable and thereby forced him to quit his job." *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1350 (4th Cir. 1995) (alterations and internal quotations omitted); Appellant's Br. at 22. McKinney remains employed by G4S.

inconsistent with his statement that the first shift is a better, more desirable job. Accordingly, we conclude that no tangible employment action was taken against McKinney.

Next, we must decide whether G4S exercised reasonable care to prevent and correct any harassing behavior. *See Ellerth*, 524 U.S. at 765. "Distribution of an anti-harassment policy provides compelling proof that the company exercised reasonable care in preventing and promptly correcting . . . harassment," and the "only way to rebut this proof" is upon a showing that the employer adopted or administered the policy in bad faith or that the policy was otherwise defective or dysfunctional. *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266 (4th Cir. 2001) (internal quotation omitted) (addressing sexual harassment). McKinney makes no such showing here.

G4S had an anti-harassment policy, and the record does not support McKinney's contention that it was defective for any of the reasons he asserts: that employees falsely claimed they had been retrained, that fire chief Altizer discouraged employees from reporting harassment, that Lewis was fired for unrelated reasons, and that no remedial action was taken against Allison, Gellner, and Gravley. We consider, and reject, each reason in turn. Discrete pockets of resistance do not show that the entire policy was defective or adopted in bad faith.

McKinney points to nothing in the record to suggest that Altizer's hostility toward reporting misconduct was anything other than an isolated instance of one individual acting to undermine the policy. Moreover, Altizer's actions were not reported, and

11

McKinney does not claim that he knew of them at the time or that he would have been dissuaded by them.

Nor does the evidence suggest that G4S failed to promptly correct the harassing behavior. *See id.* at 267. That Allison, Gellner, and Gravley escaped termination does not itself show that G4S did not adequately address harassment. Title VII requires that an employer take reasonable steps to stop harassment, not dispense with appropriate procedures for dealing with the accused or discharge any accused harasser. *EEOC v. Xerxes Corp.*, 639 F.3d 658, 674–75 (4th Cir. 2011). Allison, Gellner, and Gravley denied McKinney's accusations that they were laughing while standing by the noose with Lewis. Handel decided that the appropriate action with respect to them was to require that they undergo diversity training. This response was prompt and proportional in light of the disputed facts and that McKinney did not allege that the three made racist statements to him. *See id.*

Nunn's October 2014 use of the n-word and reference to a woman as a "cakey-headed bitch" does not reflect poorly on G4S's response to the May 2013 incidents because Nunn was promptly suspended and told that a repeat offense would result in termination.

McKinney argues that G4S's response to the May 23, 2013, harassment was inadequate because the decision to remove Lewis was due to BAE's request. We disagree. Even if G4S fired Lewis with mixed motives, this court inquires into the effectiveness of an employer's remedial action, not the motivation underlying it. *See Mikels v. City of Durham*, 183 F.3d 323, 330 (4th Cir. 1999) ("We have not required that

12

particular remedial responses be the most certainly effective that could be devised and have given great weight to the fact that a particular response was demonstrably adequate to cause cessation of the conduct in question."); *Spicer v. Va., Dep't of Corr.*, 66 F.3d 705, 711 (4th Cir. 1995) (en banc) ("[W]hen an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well."). Moreover, G4S independently decided to *terminate* Lewis; Suthers only requested that G4S *remove* Lewis from the contract at RFAAP.

McKinney cites a Seventh Circuit case to support his theory that "if the right action is taken for the wrong reason, it was not an action to remedy illegal harassment." Appellant's Br. at 33. This case, however, is less helpful than he contends. It merely makes the point that "[j]ust as an employer may escape liability even if harassment recurs despite its best efforts, *so it can also be liable if the harassment fortuitously stops, but a jury deems its response to have fallen below the level of due care.*" *Smith v. Sheahan*, 189 F.3d 529, 535 (7th Cir. 1999) (emphasis added). *Sheahan* merely affirms that an employer's inadequate response does not defeat liability if, by mere coincidence, the harassment stops. *Sheahan* contemplates the response's adequacy, not its motivation. It does not even imply that an employer responds inadequately by considering factors unrelated to the harassment. *See Loughman v. Malnati Org., Inc.*, 395 F.3d 404, 407 (7th Cir. 2005) (citing *Sheahan* in analysis of adequacy of employer's response). An employer's decision to consider additional factors in deciding to terminate an alleged harasser does not render the response inadequate when it *guarantees* that the wrongdoer will not be able to continue workplace harassment.

13

Third, we must decide whether McKinney unreasonably failed to take advantage of G4S's preventative or corrective measures. *See Ellerth*, 524 U.S. at 765. As this court has noted, "any evidence that [the employee] failed to utilize [the company's] complaint procedure 'will normally suffice to satisfy [its] burden under the second element of the defense.'" *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 182 (4th Cir. 1998) (quoting *Faragher*, 524 U.S. at 808); *Barrett*, 240 F.3d at 267. In contravention of G4S's policy, McKinney did not "immediately" report to his "supervisor, a manager, or the Corporate Human Resources Department," J.A. 576, Roth's 2011 use of the n-word, Altizer's 2012 "colored boy" comment, or the May 2013 noose and sheet incidents, even though he began to record his workplace conversations in an attempt to prepare to file suit. Failure to report harassment because of a generalized fear of retaliation or belief in the futility of reporting harassment deprives the employer of an opportunity to take corrective action and does not justify the failure to report or the decision to gather evidence by recording workplace interactions. *Barrett*, 240 F.3d at 267–68. For the same reasons, we reject McKinney's claim that he reported the noose and sheet incidents to Penland (who was not a G4S employee or someone G4S's policy directed employees to complain to) because going around G4S was the only way to get results at RFAAP.[6]

---

[6] Allen's prompt response following the May 2013 incidents suggests that McKinney's fear was not well-founded. Further, we note that McKinney did not personally initiate contact with Allen; a receptionist at the facility informed Allen of what had occurred, and Allen reached out to McKinney.

14

Accordingly, we conclude that summary judgment in favor of G4S on McKinney's hostile work environment claims was proper. There is no genuine dispute of material fact that G4S is entitled to the *Faragher/Ellerth* affirmative defense because McKinney suffered no tangible employment action, G4S exercised reasonable care to prevent and correct harassing behavior, and McKinney unreasonably failed to take advantage of the preventive or corrective opportunities G4S established. *See Ellerth*, 524 U.S. at 765.

B.

The plaintiff in a Title VII or § 1981 retaliation case must establish that "1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a causal connection existed between the protected activity and the adverse action." *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) ("A prima facie retaliation claim under 42 U.S.C. § 1981 has the same elements [as a Title VII claim]."). "The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm," and applies to conduct that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006) (internal quotation omitted). For the reasons that McKinney's two counseling forms did not constitute a tangible employment action--they had no effect on the terms or conditions of his employment--they also do not meet the retaliation standard of being

15

materially adverse.[7]   The two counseling forms and minor workplace grievances McKinney complains of would not have dissuaded a harassment victim from reporting misconduct.  *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 189 (4th Cir. 2004) (no adverse employment action from victim "being excluded from certain meetings and emails," receiving "negative employment evaluation," and being "ostracized by certain employees"); *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271–72 (4th Cir. 2001) ("uncivility of co-workers" insufficient to establish adverse employment action, particularly where there is no allegation "that [the company] instructed . . . co-workers to ostracize [the accuser]").  Thus, we conclude that summary judgment in favor of G4S on McKinney's retaliation claims was proper.

C.

Finally, under Virginia law, an IIED plaintiff must prove by clear and convincing evidence that "the wrongdoer's conduct is intentional or reckless; the conduct is outrageous and intolerable; the alleged wrongful conduct and emotional distress are causally connected; and, the distress is severe."  *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991).  The tort of intentional infliction of emotional distress is a disfavored cause of action.  *Id.*  McKinney claims that he suffers from increased blood pressure (142/88 as of November 2014), sleeplessness (only 2 or 3 hours each night), and nervousness and

---

[7] The causation element is not satisfied as to the two counseling forms, which are an important part of McKinney's claim.  Allison gave McKinney the two counseling forms *before* McKinney engaged in protected activity by complaining to Penland.

anxiety due to the harassment. He also claims that the harassment caused him to suffer problems in his marriage. "But liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Id.* at 163. A victim's complaint that he "was nervous, could not sleep, experienced stress and 'its physical symptoms,' withdrew from activities, and was unable to concentrate at work" is insufficient to establish severe distress. *Id.* We conclude that summary judgment in favor of G4S on McKinney's IIED claim was proper because no reasonable jury could find that he suffered the severe emotional distress required to sustain the claim.

III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

17